982 F.2d 206
 E. Douglas BRAZELL and Emory Brazell,
Plaintiffs-Appellees/Cross-Appellants,
v.
FIRST NATIONAL BANK AND TRUST COMPANY OF ROCKFORD,
Defendants-Appellants/Cross-Appellees.
 Nos. 91-3142, 91-3165.
 United States Court of Appeals,
Seventh Circuit.
 Argued Oct. 22, 1992.
Decided Dec. 14, 1992.
Order Denying Rehearing and Clarifying Opinion Jan. 13, 1993.
 
 Theodore Liebovich, Rockford, IL, Alan W. Cargerman (argued), William P. Fearer, Fearer, Nye, Ahlberg & Chadwick, Oregon, IL, for plaintiffs-appellees.
 Michael A. Ficaro, John P. Ratnaswamy (argued), Hopkins & Sutter, Chicago, IL, for defendants-appellants.
 Before POSNER and COFFEY, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.
 POSNER, Circuit Judge.
 
 
 1
 This is a diversity suit for fraud and breach of contract, brought against a bank by major shareholders of one of the bank's borrowers. The bank counterclaimed, seeking to enforce the shareholders' guarantees of the borrower's debt to the bank. A jury found fraud and awarded the plaintiffs more than $500,000 and rejected the counterclaim. The bank appeals, arguing that no reasonable jury could have found fraud (let alone by clear and convincing evidence, as Illinois law requires, Hofmann v. Hofmann, 94 Ill.2d 205, 222, 68 Ill.Dec. 593, 600, 446 N.E.2d 499, 506 (1983); Mercado v. United Investors, Inc., 144 Ill.App.3d 886, 894, 98 Ill.Dec. 702, 707, 494 N.E.2d 824, 829 (1986)) on the basis of the evidence presented at the trial. The plaintiffs cross-appeal, complaining about the judge's dismissal of their claim for breach of contract.
 
 
 2
 In 1981, Lace Motor Sales, Inc., an automobile dealership in Oregon, Illinois, obtained a $1.2 million floor-plan line of credit from the First National Bank and Trust Company of Rockford, Illinois. Floor planning is a revolving credit arrangement designed for automobile and other vehicle dealers, the loan to the dealer being secured by the dealer's inventory and by the proceeds of the sales from the inventory. Lloyd Lace, the owner of Lace Motors, dealt with Carl Accardo, the bank's senior vice-president in charge of dealer financing, in setting up the line of credit. The following year, Lloyd's son Steve began managing the dealership. At his request, one of the plaintiffs, Douglas Brazell, joined the board of directors of Lace Motors; soon he and his brother, Emory Brazell, the other plaintiff, had each acquired 12.5 percent of the corporation's stock. In August 1983 the Brazells agreed to guarantee the corporation's debt to the bank. In December the bank raised Lace Motors' line of credit to $1.9 million, but Accardo warned Lace that the bank "would expect profits [of Lace Motors] in excess of $100,000, ... no further overdrafts on the general checking account, and ... a minimum balance in that account in the amount of $10,000." The following year, 1984, the Brazells doubled their stock holdings in Lace Motors; they now owned half the corporation's stock. They also began engaging in other business ventures with Steve Lace. In November, during a game of golf, Douglas Brazell asked Accardo about the financial condition of Lace Motors, and Accardo answered, "It seems to be in good shape." That was the first time either of the Brazell brothers had inquired of the bank about Lace Motors' financial situation.
 
 
 3
 Bank employees called "checkers" visited the premises of Lace Motors monthly, armed with lists of the vehicles that were supposed to be in inventory and thus to be securing the bank's loan. If a vehicle was missing, the checkers asked employees of Lace Motors for an explanation. According to the checkers' testimony, they were satisfied with the explanations they received; however, the checkers' records for the first three years of the arrangement had been destroyed by the time of trial. Finally in May 1985 a member of the bank's auditing department conducted a floor-plan audit of Lace Motors which revealed that 39 vehicles were "out of trust"--that is, they had been sold without remission of any of the proceeds to the bank to pay down the floor-plan loan. By July, when Accardo, having been informed of the situation, met with Steve Lace and Douglas Brazell to discuss it, Lace Motors was out of trust to the tune of almost $500,000. At the meeting the bank agreed not to accelerate the dealership's debt or take other measures it could have taken to protect its loan. In exchange, Douglas Brazell put up collateral to secure the brothers' guarantees of the dealership's debt to the bank. This process of forbearance and collateralization continued through January 1986. In February, Emory Brazell renounced on behalf of himself and his brother any further efforts to save Lace Motors, whereupon the bank shut the dealership down, seized the remaining inventory, and applied the collateral that the Brazells had put up as backing for their guarantees--collateral that now exceeded $1 million--to the unpaid portion of the bank's loan. This left the bank still short by more than $250,000, the amount it is seeking in its counterclaim. Oddly, while finding fraud the jury did not make the Brazells whole, for they had paid the bank more than $1 million on their guarantees. In effect the jury ordered the bank to reimburse the Brazells only half of what they had lost as a result of the alleged fraud.
 
 
 4
 The plaintiffs' theory of fraud is that sometime before August 1983, when they first guaranteed Lace Motors' debt to the bank, the bank realized that the dealership was going down the drain so it conspired with Steve Lace to shift the impending loss to the Brazells by inveigling them into guaranteeing the dealership's debt. The reason the plaintiffs must prove conspiracy is that there is no evidence that the bank made any representations to the Brazells during or before August 1983 to induce them to issue the guarantees. Indeed the only evidence of representations concerns the conversation between Accardo and Douglas Brazell on the golf course, which took place more than a year later. But Lace must have said something to the Brazells to induce them to guarantee his company's debt to the bank, and if in doing this Lace was acting in cahoots with the bank, to protect what was in effect their (Lace's and the bank's) joint interest in the solvency of the dealership, the bank would be a party to a conspiracy to defraud the Brazells. So this is one of those rare cases in which a charge of civil conspiracy actually adds something to the substantive charges. Niehus v. Liberio, 973 F.2d 526, 531-32 (7th Cir.1992); compare Stauffacher v. Bennett, 969 F.2d 455, 459 (7th Cir.1992).
 
 
 5
 The main evidence of fraud and conspiracy that the plaintiffs presented at trial was evidence that the bank had been negligent, indeed grossly negligent, in monitoring the security for its loan to Lace Motors--security consisting of the bank's lien on the dealership's inventory. Ancillary evidence included the golf-course conversation, the destruction of the checkers' records, the letter we quoted from Accardo warning Lace Motors to keep its house in order, and the fact that Accardo had made a deal with Steve Lace whereby the latter agreed to give him golf clubs for referring customers to Lace Motors. But the plaintiffs placed their main emphasis on the evidence of the bank's negligence: the checkers were too quick to accept the explanations tendered by Lace Motors' personnel for missing vehicles. Carelessness by itself, however, cannot support an inference of fraud. Otherwise the tort of fraud would be little if anything more than a special case of the tort of negligence. Negligent misrepresentations are, it is true, sometimes actionable, but the plaintiffs in this case do not argue negligent misrepresentation, perhaps because of doubt whether in Illinois the doctrine is applicable to firms that are not in the business of furnishing information, a question expressly left open in Board of Education v. A, C & S, Inc., 131 Ill.2d 428, 452-54, 137 Ill.Dec. 635, 646-48, 546 N.E.2d 580, 591-92 (1989). It is also true that a fiduciary can be sued for constructive fraud, which does not require proof of deliberate falsity either. Vermeil v. Jefferson Trust & Savings Bank, 176 Ill.App.3d 556, 564, 126 Ill.Dec. 603, 607, 532 N.E.2d 288, 292 (1988). But it does require (in Illinois, at least) proof of a fiduciary relation, and a creditor is not ordinarily his guarantor's fiduciary. Farmer City State Bank v. Guingrich, 139 Ill.App.3d 416, 424, 94 Ill.Dec. 1, 7, 487 N.E.2d 758, 764 (1985). We are left with actual, that is, deliberate, fraud.
 
 
 6
 Selective carelessness might be evidence of deliberate fraud. If the checkers checked Lace Motors less carefully than they checked the bank's other floor-planning dealers, this would be some evidence--though very little, standing by itself--that the bank knew that Lace Motors was out of trust (but didn't care because it had the Brazells' guarantees to fall back on). For, if the bank knew, it didn't have to waste its time checking; more important, it wouldn't want to create evidence that it knew by conducting a check that couldn't fail to uncover the fraud. It would play the ostrich game. But there is no evidence that the checkers did anything different in checking Lace Motors from what they did in checking the other floor-planning dealers. No inference that the bank committed fraud against the Brazells can be drawn from a general pattern of laxity in monitoring loans.
 
 
 7
 The destruction of checkers' records has no significance, as the only evidence about the matter was that the bank destroys such records when it has no reason to retain them. At the time the records were destroyed, the bank, so far as the evidence shows, did not know--did not even suspect--that Lace Motors was out of trust. It is true that in raising the dealership's line of credit Accardo in December 1983 had warned Lace against overdrafts, but overdrafts are common and, so far as appears, Lace Motors' overdrafts had been minor--trivial irritants rather than portents of catastrophe.
 
 
 8
 There is no evidence that when Accardo told Douglas Brazell in November 1984, in a brief conversation while they were playing golf, that the financial situation of Lace Motors seemed okay he was lying. The checkers had reported no violations of the security arrangement. The clean bills of health they gave Lace Motors every month were duly passed up the bank hierarchy to Accardo, who had no reason to think that things were other than fine. The jury could have disbelieved his testimony that he did not know that Lace Motors was in trouble--but for the fact that the parties stipulated that Accardo first learned about Lace Motors' troubles in May 1985, six months after the golf-course conversation. The stipulation is binding; it shows that Accardo's statement to Douglas Brazell could not have been fraudulent.
 
 
 9
 Which leaves the golf clubs. By virtue of his commission arrangement with Lace Motors, Accardo had an undisclosed conflict of interest--he had a financial stake in Lace Motors' continuation in business even if the bank's interests would have been better served by closing the dealership down and selling its inventory. But to have a conflict of interest and to commit, or conspire to commit, fraud are different things. It is true that conflicts of interest play a big role in cases of constructive fraud, Maksym v. Loesch, 937 F.2d 1237, 1241-42 (7th Cir.1991), but remember that we are dealing here with a case in which the charge is actual, not constructive, fraud.
 
 
 10
 So much for Accardo; and there is no evidence that anyone else connected with the bank, before the floor-plan audit conducted in May 1985 and promptly reported to Accardo, knew that Lace Motors was in trouble, let alone schemed with Steve Lace to shift the burden of the impending loss to the Brazells. Nor is there any evidence that after May 1985 the bank, having learned about the dealership's difficulties, dealt with the Brazells with other than complete candor. A telling piece of evidence against an inference of conspiracy is the testimony of Brian Savage, Lace's office manager, that part of his job had been to deceive the bank into thinking that Lace Motors was in good financial health and in full compliance with the floor-planning arrangement. We do not understand the plaintiffs to deny this job description, difficult as it is to square with the hypothesis that the bank and Steve Lace were in cahoots to conceal Lace's fraud, though we suppose it is possible that Lace through Savage was trying to doublecross its co-conspirator, the bank.
 
 
 11
 If anyone should have caught on to Steve Lace's fraud it was not the bank that Lace's office manager was trying to deceive; it was the Brazells--friends and business associates of Lace, sophisticated businessmen (Douglas Brazell was among other things a director of a bank), and between them owners of half the stock in the dealership. To render the verdict it did the jury could not have understood the meaning of fraud. It must have thought that the bank should be punished for not having been more alert and that the Brazells' lack of alertness would be punished enough by making them swallow half their loss. Fraud is not, however, a vehicle for allocating losses among a group of careless people. It is not a synonym for comparative negligence, or a device for making banks the insurers of the owners of the firms that borrow from them. There is no evidence of fraud in this case, let alone clear and convincing evidence, so the bank was entitled to judgment notwithstanding the verdict.
 
 
 12
 We turn to the cross-appeal, in which the Brazells complain mainly about the judge's having dismissed the breach of contract count in their complaint. This count charged that the duty of good faith which Illinois law reads into every contract required the bank to advise the Brazells, as guarantors, of circumstances that materially increased the risk that the borrower whose debt the guarantors had guaranteed would default. The judge dismissed the claim because the guarantees contain a broad waiver of any right to complain about the bank's handling of the borrower's collateral. The guarantees would have been unaffected, the judge reasoned, even if the bank had released all its collateral--all the unsold vehicles--and thus converted its secured loan to Lace Motors to an unsecured one.
 
 
 13
 Continental Bank, N.A. v. Everett, 964 F.2d 701 (7th Cir.1992), disposes of the plaintiffs' claim. The guarantors in that case complained that the bank had acted in bad faith by failing to insist on adequate security for the loan which they had guaranteed and to advise the guarantors of its failure. In rejecting the claim we pointed out that the concept of good faith in Illinois law is a "gap filler"; that is, it interpolates contractual duties that the parties would in all likelihood have agreed to impose if they had had perfect foresight or could have contracted costlessly over even remote contingencies. Id. at 705; see also Market Street Associates Limited Partnership v. Frey, 941 F.2d 588, 595 (7th Cir.1991). It therefore has no application when the parties have provided expressly for the contingency in question--here the possibility that the bank would release the collateral that the floor-planning arrangement gave it in Lace Motors' unsold vehicles.
 
 
 14
 The bank did not want a release of the collateral to release the guarantors, so it negotiated for an express waiver of the guarantors' common law right to cancel their guarantee if the debtor releases collateral without the guarantor's consent. McHenry State Bank v. Y & A Trucking, Inc., 117 Ill.App.3d 629, 633, 73 Ill.Dec. 485, 489, 454 N.E.2d 345, 349 (1983). Such a waiver is perfectly reasonable and courts enforce it. Ishak v. Elgin National Bank, 48 Ill.App.3d 614, 617, 6 Ill.Dec. 630, 632, 363 N.E.2d 159, 161 (1977); Continental Bank, N.A. v. Everett, supra, 964 F.2d at 704-05. If the bank thought its loan fully collateralized, it would not need guarantees. It needed the guarantees against the possibility that the collateral wouldn't be there when the time for repaying the loan arrived. That might be due, as here, to the borrower's dishonesty. It might be due to the lender's decision to try to shore up the borrower by giving him more latitude to borrow from other sources. It might be due, as may have been the case here along with the borrower's dishonesty, to the bank's own carelessness. But people frequently insure themselves against the consequences of their own carelessness. That of course is the main office of liability insurance. Guarantyship is a form of insurance. It is true that the release in this case, unlike the releases in the Ishak and Everett cases, does not refer to negligence. But the Brazells make nothing of this distinction; and as the guarantors surrendered their right to complain even if the bank released the collateral deliberately, we do not think they should be heard to complain if the bank, while trying to preserve the collateral for its sake and theirs, botched the attempt and lost it. A release is a release whether it is deliberate or accidental. The point of the release clause, so far as we can determine, was to divorce the guarantors' obligation from anything that might happen to the collateral.
 
 
 15
 The dismissal of the contract count is affirmed, the judgment in favor of the plaintiffs on the fraud count is reversed, and the case is remanded with directions to enter judgment for the defendant dismissing the suit.
 
 
 16
 AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS.
 
 ORDER
 
 17
 Jan. 13, 1993.
 
 
 18
 The petition for rehearing is DENIED, no member of the panel having voted to grant it. The parties having agreed that if the petition for rehearing was denied the petition to clarify our opinion to make clear that the bank is entitled to judgment on its counterclaim should be granted, the petition to clarify is GRANTED.