**Harold STROMBERGER,**
**Plaintiff–Appellant,**

v.

**3M COMPANY, Defendant–Appellee.**

No. 92–1928.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 10, 1992.
Decided April 9, 1993.

---

Paula M. Carstensen, John J. Reidy, James R. Quinn, Dean J. McElroy, Ruff, Weidenaar & Reidy, Chicago, IL, for plaintiff-appellant.

Michael D. Dabertin, Mary P. Chapin, Russell M. Pelton, Oppenheimer, Wolff & Donnelly, Chicago, IL, Thomas P. Kane (argued), Andrea J. Nordaune, Oppenheimer, Wolff & Donnelly, St. Paul, MN, for defendant-appellee.

Before POSNER and RIPPLE, Circuit Judges, and CRABB, Chief Judge.*

POSNER, Circuit Judge.

This is a suit, primarily for fraud in violation of the common law of Illinois, that has been brought in federal court under the diversity jurisdiction. A count that charged a violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634, was dismissed early on because the plaintiff had not filed a timely charge with the Equal Employment Opportunity Commission. Later the court granted summary judgment for the defendant on the fraud counts, and dismissed the suit in its entirety. The appeal is limited to the fraud counts. We construe the facts as favorably to the plaintiff as the record permits, in view of the procedural setting.

From 1969 to 1989 Harold Stromberger was employed as a salesman by Minnesota Mining & Manufacturing Company, "3M" as it is commonly called. A successful salesman, Stromberger had reached the highest compensation level for 3M's salesmen. One of his supervisors, however, Duane Fowler, didn't like Stromberger—considered him "a cry baby and a whiner." There is no evidence that this was the general opinion of him held by the company.

In mid–1989 3M decided to "downsize" by eliminating 200 employees from its Information Systems Group—the division in which Stromberger was employed. Stromberger does not contend that this plan was adopted in order to get rid of him or any other particular employee; it was intended merely to reduce the size of the Informa-

---

* Hon. Barbara B. Crabb, Chief Judge of the West- ern District of Wisconsin, sitting by designation.

tion Systems Group. 3M wanted to do this without firing or laying off anybody, so it offered a Voluntary Severance Pay Plan keyed to length of service. Stromberger had twenty years of service and so could claim eleven months' pay, which came to $38,674, if he elected to participate in the plan. 3M's hope was that the plan would entice its target number of 200 employees to quit but if not, it said, it would place some employees on the "unassigned list." Employees placed on that list have six months in which to find another job (not necessarily at their existing salary) within 3M. During that period they don't work but they draw full pay.

October 18 was set as the deadline for employees to decide whether to participate in the Voluntary Severance Pay Plan. A week before the deadline, Stromberger's immediate supervisor (not Fowler) told a meeting of the Information Systems Group's salesmen that effective on the first day of the New Year (1990) the annual sales quota for each salesman would be raised to $450,000 and a second failure to meet it would result in the salesman's being fired without benefits. In other words, the salesman could miss the quota one year without losing his job. The supervisor added that the Voluntary Severance Pay Plan had been approved by 3M's lawyers and that any salesman who didn't think he could meet the new quota should take the severance pay and run. Not only was the new quota much higher than the old (though, oddly, we cannot find in the record how much higher), but it was unprecedented to announce the annual quota before the year began. Many of the salesmen considered the announcement of the quota a week before they had to decide whether to participate in the Voluntary Severance Pay Plan an attempt to nudge them to participate in the plan—in other words, to quit.

Stromberger considered the new quota too high. He complained to higher-ups in the company but they refused to back off. He got the impression that the quota was indeed a quota and not merely a goal or target. One of his superiors suggested to Stromberger that he go on the unassigned list. Stromberger was unwilling to do so

unless he obtained concessions, such as an extension of the period on which one could remain on the list from six to ten months; these concessions were refused. Fearing that he could not find another job within 3M within six months without taking a drastic cut in pay, and that he could not make the new quota and thus would be fired, he reluctantly elected to resign and receive his benefits under the Voluntary Severance Pay Plan. Later he discovered that not all the salesmen in his group had in fact been given a $450,000 quota for 1990, that those who had failed to meet the lower quota which they had been given had not been fired, and that some employees who had been placed on the unassigned list had been allowed to remain on it for more than six months. Concluding that 3M had defrauded him into quitting his job, Stromberger brought this suit.

■■■ There is a question about Stromberger's fraud claim so fundamental that neither party has addressed it. It is whether Stromberger was defrauded *of anything*. In stating the elements of fraud, courts skip over, as too obvious to require comment, that the fraud made the victim of it worse off than he would have been had there been no fraud. In fact this essential element is implicit in the requirement that the victim of the fraud show that he relied on the misrepresentations or misleading omissions constituting the fraud to his detriment, *Soules v. General Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980), and in the general requirement of tort law, which is as applicable to fraud as to any other tort, that the victim prove he was injured. *Id.* While the victim of a breach of contract is entitled to nominal damages even if he is not injured by the breach, *Olympia Hotels Corp. v. Johnson Wax Development Corp.*, 908 F.2d 1363, 1372 (7th Cir.1990); E. Allan Farnsworth, *Contracts* § 12.8 at p. 871 (2d ed. 1990), because the breach itself is the wrong, there is no tort without injury. *Niehus v. Liberio*, 973 F.2d 526, 531–32 (7th Cir.1992). The near miss is not actionable. Yet like the air we breathe, the requirement of proving that the fraud actu-

ally made its victim worse off is frequently and here taken for granted rather than singled out for comment.

■ Stromberger was an employee at will. He could be fired at the whim of his employer. He could be fired because a superior thought him a cry baby and a whiner, even if he was—as apparently he was—an excellent salesman. (3M denies having wanted him to quit.) His theory of fraud is that 3M wanted to get rid of him and lied to do so—lied by telling him that he would have to make an impossibly higher quota and could not stay on the unassigned list for more than six months if, to avoid having to meet the quota, he sought another job within 3M. But if 3M wanted to get rid of him there was nothing to stop it from firing Stromberger outright. His lawyer said at the oral argument in this court that 3M would have been better off firing Stromberger; it would have achieved what Stromberger claims to have been its objective of getting rid of him, without buying a lawsuit. The implication is that, but for the alleged fraud, he would have been fired anyway—so what did he lose from the fraud? Suppose 3M had thought him an incompetent employee, but to salve his feelings told him falsely that it was discharging him because its business was about to fail. This falsehood would not support an action for fraud, because it would not have made him any worse off than he would have been had the company been brutally frank with him. Yet that is Stromberger's theory of fraud as his lawyer articulated it in his briefs and at argument.

At argument both sides intimated that the policy of 3M is not to lay off or discharge employees whose performance was satisfactory, though there is no suggestion that this policy ever ripened into an enforceable promise that transformed employment at will into a tenure contract. And we know that Stromberger originally joined an age-discrimination claim to his fraud claim. Maybe 3M was trying to defraud Stromberger of his age-discrimination claim by deceiving him into quitting "voluntarily," or maybe it was trying to conceal from all its workers the uncertainty of their tenure, lest it be forced to pay higher wages than a company which in fact has a policy of not laying off or discharging employees other than for cause. What it could not be defrauding Stromberger of was a job to which he had no right.

The case bears at least a passing resemblance to *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429 (7th Cir.1987), surprisingly not cited by either party. That was a fraud case brought by an employee, Jordan, who like Stromberger was an employee at will. A junior executive, Jordan had been permitted to buy stock in his employer, Duff and Phelps, on condition that he surrender it at book value if he quit. He quit while the management of Duff and Phelps was negotiating to sell the company at a price that would have greatly increased the value of Jordan's shares. (The sale fell through but Duff and Phelps was later recapitalized on terms that, according to Jordan, were almost as favorable to shareholders as the aborted sale would have been.) Jordan's superiors did not tell him, when he discussed quitting, that the company was "in play" and his shares might, if he didn't quit, become much more valuable. Had he known, he might not have quit. Yet if the company had wanted to cut him out of his share of the profits it presumably could have done so by firing him, since he was, as we said, an employee at will.

Nevertheless we held that he could maintain an action for fraud against the company. There are two ways to read the opinion. One is that we in effect lengthened the list of rights that employees at will retain. Just as it would violate federal law to fire an employee at will on grounds of age, race, sex, etc., and just as it would violate state common law to fire him in retaliation for his having filed a workers' compensation claim against the employer, so also it would violate state common law to fire an employee in order to deprive him of an opportunity that he had earned by being a satisfactory employee. *Id.* at 437–38. The second interpretation is that while the company could fire Jordan for any reason or no reason, it could not, by firing him

for no other reason than to prevent him from sharing in the bonanza anticipated from the sale of the company, deny him his share. *Id.* at 439.

Either way, Jordan was held to have had an implied contractual right that Duff and Phelps had winkled him out of by failing to disclose information that might have dissuaded him from quitting. Stromberger does not claim any contractual right of which he was deprived by being persuaded to quit. He did not lose anything. On the contrary, the only consequence of the alleged fraud was to *enrich* him by $38,674, since, according to him, if he had refused to quit he would have been fired, in which event he would have been entitled to no severance or other benefits at all. He now has buyer's remorse. 3M did not enforce the harsh new quota, so that it now appears that Stromberger would have been better off not quitting; and perhaps he has had more difficulty than he anticipated finding another job, though we have found nothing in the record on this. Yet at least according to his litigation position Stromberger does not believe that he would have been better off rejecting the severance package, because he believes that 3M was out to get him. It could have got him very easily—by firing him. And then he would have had nothing.

The case might be different if Stromberger could show that, but for the alleged fraud, he would not have quit *or* been fired. For then he would have lost something—an expectation of continued employment, albeit not a right to it, because he had no such right. We need not decide whether the loss of such an expectation is the sort of injury that will support an action for fraud. Ours is a different case, one in which the plaintiff himself makes allegations that if believed show that he would have been no better off had the fraud not occurred.

 Although puzzled by how this case can be maintained as a fraud case even if there were misrepresentations, we agree with the district court that there was no evidence of misrepresentations, let alone clear and convincing evidence, as Illinois law requires. *Hofmann v. Hofmann,* 94 Ill.2d 205, 222, 68 Ill.Dec. 593, 600, 446 N.E.2d 499, 506 (1983); *Brazell v. First National Bank & Trust Co.,* 982 F.2d 206, 207 (7th Cir.1992). It is true that the statements which induced Stromberger to quit— that the 1990 quota would be $450,000 and would be rigorously enforced and that he could not stay more than six months on the unassigned list—turned out not to be true. But this is a case allegedly of deliberate, not negligent, misrepresentation. Stromberger could obtain a judgment only by proving that 3M knew the statements were false. Of that there is not a shred of evidence. Fraud in the sense of deliberate deceit cannot be inferred from falsity alone. *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 276 (2d Cir. 1992). Otherwise every case of a mistaken representation would raise a jury issue of fraud.

 No doubt some statements are so outlandish that no one in his right mind could think them true when he said them, and then intent to defraud could be inferred from the statement itself, cf. *United States v. Tranowski,* 659 F.2d 750, 761 (7th Cir.1981)—though if so the plaintiff would be hard-pressed to prove *reasonable* reliance on them, another prerequisite to fraud. But this is not a case of representations so outlandish as to display a badge of fraud. Faced with a command from on high to downsize, the Information Systems Group naturally wanted to identify those salesmen who thought they could sell more than they were selling at present, so that the group could maintain its sales with a smaller sales force. And naturally it didn't want to commit itself to keeping employees who are doing no work but drawing full pay for more than six months while they look for another job within the company. Having taken a hard line on both points the company later found that the realities of the market required it to relent and make exceptions, and it did so. This is no evidence that it concocted a fraud to get rid of Stromberger or anyone else.

Although companies do sometimes act against their self-interest, it would be ex-

traordinary if merely to preserve a reputation for not laying off people a company would deliberately throw its sales force into turmoil by giving them quotas that it knew they couldn't meet and telling them they would be fired if they didn't meet them. That would be a formula for losing the entire sales force, or at least the best salesmen—those with the best opportunities elsewhere. The scheme that Stromberger imputes without evidence to the company would have been Machiavellian, all right, but it would also have been stupid.

AFFIRMED.

RIPPLE, Circuit Judge, concurring in the judgment.

Although the issue is a close one, I believe that the district court correctly determined that there is no genuine issue of triable fact that justifies further proceedings on Mr. Stromberger's allegation that 3M fraudulently induced his resignation. The record will not support the allegation that 3M knowingly made a false statement of material fact, *see Gerill Corp. v. Jack L. Hargrove Builders, Inc.,* 128 Ill.2d 179, 131 Ill.Dec. 155, 161, 538 N.E.2d 530, 536 *cert. denied sub nom.* 493 U.S. 894, 110 S.Ct. 243, 107 L.Ed.2d 193 (1989), or engaged in a scheme to defraud. *See Stamatakis Indus., Inc. v. King,* 165 Ill.App.3d 879, 117 Ill.Dec. 419, 421–22, 520 N.E.2d 770, 772–73 (1987).

Two considerations prevent my joining the ground of decision adopted by my colleagues. First, I have difficulty in concluding, on the basis of the record before the district court, that Mr. Stromberger would have been discharged if he had not resigned. As the district court notes, such a conclusion is difficult to square with 3M's offer of a second chance at employment through the unassigned list even after Mr. Stromberger had resigned. More importantly, I believe that, when our jurisdiction is based on a diversity of citizenship, we ought to be very circumspect in choosing as an alternate ground for decision an interpretation of state law that has not been briefed fully by counsel or addressed by the district court. This caution is especial-

ly important when, as here, this court's interpretation may impact on the economic life of the state in a way never intended by its legislature or its judiciary. The court's application of the law of fraud to the at-will employee provides a significant weapon for an employer intent on "downsizing," however ruthlessly, its business. It will not go unnoticed. While the Illinois courts are, of course, free to ignore our interpretations of Illinois law, it would be unrealistic to discount the impact of this court's holding until Illinois either confirms or denies that this interpretation represents accurately the public policy of Illinois. As the district court's opinion demonstrates, there is a more conventional ground for decision. We should rely upon it.