**HYDRITE CHEMICAL COMPANY, Affiliated Chemical Group, and National Union Fire Insurance Company of Pittsburgh, Pennsylvania, Plaintiffs–Appellants, Cross–Appellees,**

v.

**CALUMET LUBRICANTS COMPANY and United States Fidelity and Guaranty Company, Defendants–Appellees, Cross–Appellants.**

Nos. 94–2058, 94–2224.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 24, 1994.

Decided Feb. 14, 1995.

Peter C. Karegeannes (argued), Christopher H. Kallaher, Quarles & Brady, Milwaukee, WI, for Hydrite Chemical Co., Affiliated Chemical Group and National Union Fire Ins. Co. of Pittsburgh, PA.

Ned J. Czajkowski, Russell A. Klingaman (argued), Hinshaw & Culbertson, Milwaukee, WI, for Calumet Lubricants Co., and U.S. Fidelity and Guar. Co.

Before POSNER, Chief Judge, BAUER, Circuit Judge, and WILL, District Judge.*

POSNER, Chief Judge.

Before us are cross-appeals in a diversity breach of warranty suit arising out of the sale by Calumet Lubricants Company, the principal defendant, of a white mineral oil to Hydrite Chemical Company, the principal plaintiff. Hydrite resold the oil to George A. Hormel Company, the manufacturer of Spam, the well-known luncheon meat. (So the chain of distribution was Calumet—Hydrite—Hormel.) Hormel used the oil as a lubricant and anti-rust agent in the machinery with which it makes Spam. According to Hormel, the oil made the Spam stink. Hormel withdrew millions of pounds of Spam from the market and sued Hydrite for breach of warranty. Hydrite should have impleaded Calumet, since it believed the stink had been caused by Calumet's oil; but it did not. Instead it merely defended against Hormel's suit. Eventually the parties settled. Hydrite paid Hormel $2.25 million and received in exchange both the usual release and an assignment of any claims that Hormel might have against Calumet arising from the sale of the smelly oil. Hydrite then brought this suit, both in its own right and as Hormel's assignee, against Calumet. (There are other facts and other parties, but nothing else that bears on the appeals.) In its own right Hydrite seeks to recover the $2.25 million expense of the settlement as consequential

* Hon. Hubert L. Will of the Northern District of    Illinois.

damages of Calumet's alleged breach of warranty. The parties agreed that the applicable state law deemed Calumet to have issued an identical warranty to Hormel and to Hydrite, notwithstanding the lack of privity between Calumet and Hormel, *Housing & Redevelopment Authority v. Agassiz Construction, Inc.*, 476 N.W.2d 781, 785–86 (Minn. App.1991); *SCM Corp. v. Deltak Corp.*, 702 F.Supp. 1428, 1432–33 (D.Minn.1988), so that if it breached its warranty to one it breached it to the other. Whatever the law may be in Texas on whether the cost of a settlement can be recovered as consequential damages for breach of warranty, see *Kaiser Aluminum & Chemical Sales, Inc. v. PPG Industries, Inc.*, 42 F.3d 1147, 1149–52 (7th Cir. 1994), we do not understand Calumet to be arguing that the law of Minnesota, which governs the substantive issues in this suit, bars such recovery.

The district judge separated the trial into liability and damages phases. The liability phase was submitted to the jury in the form of a special verdict that asked (again we simplify) whether Calumet had breached its warranty that the white mineral oil it sold Hydrite was odorless, tasteless, and suitable for use involving "incidental food contact" in meat establishments, and if "yes" (and the jury answered "yes"), whether the breach of warranty had "cause[d] damage to either of [Hydrite or Hormel]," to which the jury answered "yes" to Hydrite and "no" to Hormel.

Just before the trial on damages began, the judge ruled that the jury's answer to the question about damage to Hormel would bar Hydrite from asking the jury to award it any part of the $2.25 million that it had paid Hormel to settle Hormel's suit against it. So the subject was not mentioned in Hydrite's opening statement to the jury in the trial on damages. Shortly after that trial began, however, the judge reversed himself and allowed Hydrite to introduce evidence in support of its contention that the amount it had paid in the settlement represented damages for which Calumet was liable. But the judge sustained objections to questions put by Hydrite's lawyer to officials of Hormel designed to elicit both the amount of money originally demanded by Hormel in settlement of its claims against Hydrite and statements made by these officials in support of the demand. Hydrite wanted to present this evidence in order to show that the amount for which it had settled with Hormel was reasonable. The judge excluded the evidence as being hearsay and, in any event, confusing and redundant.

The damages case went to the jury with a verdict form that so far as bears on these appeals asked the jury to determine damages under three headings: "Increased cost and lost management time"—under which the jury wrote $30,000; "Past lost profits"—$43,000; and "Settlement amount and expenses related to settlement"—$128,000. The judge, on Calumet's motion, set aside the $128,000 award on the ground that obviously the jury had added together the $40,000 in attorney's fees that Hydrite had incurred to settle Hormel's case against it and the $88,000 that Hydrite had incurred to store the defective white mineral oil that Hormel had returned to it. The judge's view was that the jury's decision not to award Hydrite any part of the settlement amount (the $2.25 million) precluded, as a matter of logic, any award of expenses incurred by Hydrite incidental to the settlement.

Hydrite appeals, seeking a new trial on damages. It argues that the judge erred in failing to take (unspecified) steps to ameliorate what it contends was the disastrous effect on the jury of forbidding the mention of the settlement in Hydrite's opening statement and then in forbidding Hydrite to put before the jury evidence of the amount and supporting rationale of Hormel's settlement demands. Hydrite also complains about the judge's striking the $128,000 in settlement expenses from the jury's award. It argues that the judge was not entitled to identify that amount with the expenses incidental to the settlement. In support of this argument Hydrite cites only cases decided by the courts of Wisconsin. But in federal trials, issues pertaining to the control of the jury are, with immaterial exceptions, governed by federal procedural law. *Mayer v. Gary Partners & Co.*, 29 F.3d 330 (7th Cir. 1994); *AM Int'l, Inc. v. Graphic Management Associates, Inc.*, 44 F.3d 572, 576–77

(7th Cir.1995). By failing to point us to any doctrine of federal law that forbade the judge to use his common sense to figure out what the jury must have thought it was doing, Hydrite has forfeited its challenge to the judge's action. We note that the *Mayer* decision was rendered two months before Hydrite filed its reply brief and that the principle of the decision was not new. See references cited at 29 F.3d at 334–35.

Calumet cross-appeals, arguing that there was no actionable breach of warranty because Hydrite should upon inspection of the white mineral oil when it was delivered have discovered the bad smell, rejected the delivery, and incurred no loss, or at least no loss for which it has sought damages.

This litigation has been marred by a number of procedural errors. The first, as we have noted already, was Hydrite's—its failure when sued by Hormel to bring Calumet into the case as a third-party defendant. Such a procedure not only is authorized by Rule 14(a) of the Federal Rules of Civil Procedure, but under the rubric of "voucher to defend" (sometimes called "vouching in") is expressly contemplated by the Uniform Commercial Code in a case in which an intermediate seller, sued for breach of warranty, wants to shift liability to its seller. UCC § 2–607(5)(a). That is this case. Hydrite's lawyer told us at argument that the reason Calumet was not impleaded was that Hydrite was concerned that if Calumet was in the picture Hormel would escalate its demands *against Hydrite.* We find this concern difficult to fathom. Had all three parties to the dispute been in the same case, the question whether a settlement by one with one of the others was reasonable would have been unlikely to arise, and there would have been no occasion for one of the parties to assign its claims to another, which produced the confusing situation in which Hydrite came before the jury pressing both its own claims and (as assignee) those of Hormel.

A recent decision by this court appears to hold that Texas law *requires* a party in Hydrite's position to vouch in its seller; it may not bring an independent suit. *Kaiser Aluminum & Chemical Sales, Inc. v. PPG Industries, Inc., supra,* at 1149–52. There is no suggestion that this is the rule in Minnesota; and there are doubts, unnecessary to resolve in this case, whether a rule of state law requiring impleader in a particular class of cases binds the federal courts, given that the procedure in cases brought in federal court, including diversity cases, is governed by federal rather than state law. The only point that we need to make here is that Hydrite would have made life easier for everyone, notably itself, had it followed the vouching-in route.

■ The second procedural bobble was Hydrite's too, in basing its challenge to the judge's interpretation of the jury's verdict on the wrong body of law, namely state rather than federal; we have already discussed this. The next error, for which we shall not attempt to apportion guilt, was to bifurcate the trial at the point where it was bifurcated. Bifurcation is a common procedural device, and although its advantages in economizing on court time are occasionally questioned, most recently in William M. Landes, "Sequential Versus Unitary Trials: An Economic Analysis," 22 *J.Legal Stud.* 99 (1993), district judges have express authority to employ it in appropriate cases, Fed.R.Civ.P. 42(b); *Sellers v. Baisier,* 792 F.2d 690, 694 (7th Cir.1986), and a decision to do so is reviewed deferentially. *Berry v. Deloney,* 28 F.3d 604, 610 (7th Cir.1994); *DeWitt, Porter, Huggett, Schumacher & Morgan, S.C. v. Kovalic,* 991 F.2d 1243, 1245 (7th Cir.1993); *Barr Laboratories, Inc. v. Abbott Laboratories,* 978 F.2d 98, 105 (3d Cir.1992). But one must carve at the joint. Cf. *McLaughlin v. State Farm Mutual Automobile Ins. Co.,* 30 F.3d 861, 870–71 (7th Cir.1994). To divide a trial so that the issue of injury and the issue of damages are tried in two separate trials is a recipe for confusion. *Miller v. Fairchild Industries, Inc.,* 885 F.2d 498, 511 (9th Cir. 1989).

■ It is true that the fact of injury and the amount of injury (damages) are analytically distinct. Tort liability requires proof of the first, that is, proof that there was injury, regardless of how much, *Stromberger v. 3M Co.,* 990 F.2d 974, 976 (7th Cir.1993), so that if the trial is divided, as is commonly done, between liability and damages, the fact

of injury belongs in the first trial and the quantification of the injury by means of an assessment of damages in the second. Liability in a contract case (including we suppose a case of breach of warranty, though authority is sparse, *Ritter v. Erlich*, 152 F.2d 181, 183 (2d Cir.1945); *Jones v. Pittsburgh Plate Glass Co.*, 246 Wis. 462, 17 N.W.2d 562, 564 (1945)), does not depend on proof of injury. Proof of liability is complete when the breach of contract is shown. *Stromberger v. 3M Co., supra*, 990 F.2d 974, 976. At that point the plaintiff is entitled to nominal damages, even if he cannot show any injury from the breach. *Id.* at 976; *Chronister Oil Co. v. Unocal Refining & Marketing*, 34 F.3d 462, 466 (7th Cir.1994); 3 E. Allan Farnsworth, *Farnsworth on Contracts* § 12.8, p. 185 (1990). So the fact as well as the amount of injury can readily be postponed to the second trial.

█ But a more important point is that there is no rule that if a trial is bifurcated, it must be bifurcated between liability and damages. The judge can bifurcate (or for that matter trifurcate, or slice even more finely) a case at whatever point will minimize the overlap in evidence between the segmented phases or otherwise promote economy and accuracy in adjudication. 9 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2389 (2d ed. 1994). Here that would have been after the jury determined whether there had been a breach of warranty and before it determined what the consequences of that breach, if any, had been—more precisely what consequences should be blamed on the defendant, Calumet.

The judge failed to do this. Buried in the special-verdict form on liability was the fatal question about damage to Hydrite and Hormel. It was natural for the judge to interpret the verdict as a determination by the jury that the cost of settlement had not been a consequence of Calumet's breach of warranty, since if Hormel had not been damaged by the breach how could the $2.25 million that Hydrite had paid Hormel have been a consequence of that breach? Natural, but wrong, as the judge eventually realized, because the jury might just have thought that Hormel, having received a generous settlement from Hydrite, had not incurred any net injury as a result of Calumet's breach; Hydrite had made it good. The judge's mistake led him to preclude Hydrite from making reference to the settlement in Hydrite's opening statement in the trial on damages, and that preclusion is the principal ground on which Hydrite seeks a new trial.

█ Ordinarily a party will not be heard to complain about an erroneous ruling that he himself precipitated. *United States v. Johnson*, 26 F.3d 669, 677 (7th Cir.1994); *United States v. Fulford*, 980 F.2d 1110, 1116 (7th Cir.1992); *United States v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir.1994); *United States v. Sharpe*, 996 F.2d 125, 129 (6th Cir.1993). The confusing verdict form was proposed by Hydrite. But even if not invited, the error here would not be a ground for reversal. Hydrite invites our attention to a literature by trial lawyers that argues that juries make up their minds about a case on the basis of the opening statements. See, e.g., Fred Lane, *Goldstein Trial Technique* § 10.01 (3d ed. 1994); Weyman I. Lundquist, "Advocacy in Opening Statements," in *The Litigation Manual: A Primer for Trial Lawyers* 425 (John G. Koeltl ed., 2d ed. 1994); James R. Lucas, "Opening Statement," 13 *U.Hawaii L.Rev.* 349 (1991). All three judges on this panel have conducted jury trials—two have conducted a great number of them—and all of us believe that the literature to which Hydrite has directed us exaggerates. We are not alone in that belief. Hans Zeisel, "A Jury Hoax—The Superpower of the Opening Statement," *Litigation*, Summer 1988, p. 17; Valerie P. Hans & Krista Sweigart, "Jurors' View of Civil Lawyers: Implications for Courtroom Communication," 68 *Indiana L.J.* 1297, 1303–04 (1993).

Of course to the extent that opening statements accurately forecast the course of the trial, the impression they make on the jury is more likely to be confirmed than contradicted by the evidence. It does not follow that jurors "tune out" after the opening statements, thinking they have heard the evidence. If that were common, most cases would be submitted to juries on stipulated facts. There is no doubt about the importance of opening statements in providing the

jury with a roadmap to the often confusing presentation of evidence that is characteristic of the Anglo–American trial—some witnesses testify only to links in an elaborate chain the end of which is not visible from their testimony, witnesses are often called out of order to accommodate their schedules, and the smooth development of each side's case is interrupted by cross-examination. But acknowledgment of the utility of opening statements is a far cry from supposing the jury mesmerized by their rhetoric, especially since the judge will have reminded the jury repeatedly that what lawyers say in a trial is not evidence.

A holding that it is reversible error to prevent a lawyer from referring in his opening statement to evidence later ruled admissible, or that reversible error in such a case can be avoided only by the judge's taking remedial steps (and what would they be? A new round of opening statements?), would create a fair amount of havoc in jury trials—a prospect to give us pause. Judges often exclude evidence before trial, for example on the ground of irrelevance—with the consequence that the lawyers cannot refer to the evidence in their opening statements—only to admit the evidence later, when the course of the trial shows that the evidence is relevant and probative after all. We do not know of anyone who has had the audacity to suggest that when this happens the party against whom the motion had been granted is entitled to a new trial, or a new opening argument. (And what is an "opening argument" in the middle of the trial?) We shall require a more powerful showing than Hydrite has made to be persuaded that preventing a lawyer from presenting every facet of his case in his opening statement infects the trial with prejudicial error.

■ The judge's rulings on statements made by Hormel to Hydrite during their settlement negotiations cannot be justified by reference to the hearsay rule. Hydrite did not wish to introduce this evidence in order to show that Hormel had sustained damages in excess of $2.25 million or had compelling grounds for extracting a settlement of that magnitude from Hydrite. It wanted to show only that, in light of the demands and supporting reasons pressed on it by Hormel, it had acted reasonably in settling the case for the amount that it did. For that purpose, it did not have to establish the truth of what Hormel had said—only that Hormel had said it. That was direct evidence, not hearsay, *Hunter v. Allis–Chalmers Corp.*, 797 F.2d 1417, 1423 (7th Cir. 1986), just as it is direct evidence, not hearsay, when a party to a dispute over a contract testifies to the offer or the acceptance made by the other contracting party. *Twin City Fire Ins. Co. v. Country Mutual Ins. Co.*, 23 F.3d 1175, 1182 (7th Cir.1994); 2 *McCormick on Evidence* § 249, p. 101 (4th ed., John William Strong ed. 1992).

■ It is true that the district judge excluded this evidence not only on the authority of the hearsay rule but also on the ground of its being confusing and redundant. But we cannot be certain that he would have excluded it without reference to the hearsay rule; and when there are serious grounds for doubt whether judicial discretion is being exercised in accordance with a correct understanding of the applicable rules of law, the deference normally granted a judge's discretionary rulings must be withheld. *United States v. Winston*, 34 F.3d 574, 581 (7th Cir.1994); *United States v. Mittelstadt*, 969 F.2d 335, 337 (7th Cir.1992); *Kinney v. Pioneer Press*, 881 F.2d 485, 493 (7th Cir.1989); *United States v. Schiavo*, 29 F.3d 6, 8 (1st Cir.1994); *Rosen v. Cascade Int'l, Inc.*, 21 F.3d 1520, 1526 n. 11 (11th Cir.1994). But we are reasonably confident that if there was error, it was not reversible error.

■ Hydrite was allowed to present a great deal of evidence concerning Hormel's demands and the grounds for them—including evidence that Hormel had threatened to seek damages of $30 million from Hydrite. The real issue, moreover, concerning Hydrite's effort to recover damages for the cost of the settlement with Hormel was not whether Hormel had a claim against Hydrite reasonably valued at $2.25 million but whether the harm to Hormel reflected in that claim had been inflicted by Hydrite or by Calumet. There was plenty of evidence that Hydrite was the culprit. The oil it bought from Calumet was a different type of oil, with a

different chemical composition, from the oil that Hydrite had previously been supplying to Hormel. Hydrite did not inform Hormel of the switch, or take adequate steps to determine whether the new oil was suitable for use with Hormel's machinery; and it may even have contaminated the new oil, before selling it to Hormel, by storing it in vats that had not been properly cleaned. So at least the jury could have found, and it could have concluded that the fault, so far as the injury to Hormel was concerned, was not Calumet's in breaching its warranty to sell Hydrite an odorless and tasteless oil but Hydrite's in selling Hormel an unsuitable and contaminated oil, without any warning. Since it is quite possible that this is indeed what the jury found, we do not think that Hydrite has succeeded in showing that the judge's evidentiary errors, if they were errors, were prejudicial.

We turn to Calumet's cross-appeal, which argues that since the bad odor of Calumet's oil was, as a matter of law, a patent defect, Hydrite should have discovered it upon delivery. A buyer who accepts goods that do not conform to the contract (and the smelly oil was such a good) forfeits any remedy unless he notifies the seller of the breach within a reasonable time "after he discovers or should have discovered" it. UCC § 2–607(3)(a). Whether he should have discovered it will depend in the first instance on how the express language of the parties' contract, or the usage of their trade deemed incorporated by implication in their contract, allocates the burden of inspection. *General Foods Corp. v. Valley Lea Dairies, Inc.,* 771 F.2d 1093, 1102–03 (7th Cir.1985) (dissenting opinion). The answer to that question will provide guidance to whether the buyer should have discovered the breach. He may have agreed to inspect every delivery, and it may be that inspection would have infallibly revealed the breach; if so and he fails to notify the seller seasonably, he is barred from any remedy. Whether that was the case here was a question of fact that the jury resolved against Calumet. The record is not clear whether the bad odor of the oil was perceptible by the type of inspection that Hydrite either was contractually obligated to undertake, or did in fact undertake whether

or not obligated to do so, upon delivery, or did not emerge until much later, when it was used in Hormel's machinery for making Spam after being resold by Hydrite. This was a jury question, further wrinkles being that the parties did not have a written contract and the oral contractual allocation of the duty of inspection is unclear, and that Hydrite purchased after testing samples, and the samples it tested may not have been ones that had the bad odor. The picture is very confused, making us particularly reluctant to disturb the jury's verdict.

Neither appeal has merit, and the judgment of the district court is therefore

AFFIRMED.