RICHARD NEIBERT *et al.*, Plaintiffs and Counterdefendants-Appellants, v. SCHWENN AGRI-PRODUCTION CORPORATION, Defendant and Counterplaintiff-Appellee.

Third District   No. 3—91—0039

Opinion filed September 12, 1991.

Sebat, Swanson, Banks, Garman & Townsley, of Danville (Gill M. Garman, of counsel), for appellants.

Tungate & Tungate, of Watseka (Susan Sumner Tungate, of counsel), for appellee.

PRESIDING JUSTICE STOUDER delivered the opinion of the court:

The plaintiffs, Richard Neibert and Joyce Neibert, appeal from a judgment entered in favor of the defendant, Schwenn Agri-Production Corporation (the Corporation). We affirm in part, reverse in part and remand.

The record shows the Neiberts were tenant farmers in Newton County, Indiana. On February 8, 1986, the Neiberts entered into four separate contracts with the Corporation, which were each entitled "Production Agreement." The contracts were identical except as to the land described and the landlord. The contracts provided that any litigation arising out of the agreements would be brought in the circuit court of Iroquois County and decided under Illinois law.

Under the the contracts, the Neiberts were to grow and harvest sunflowers on 612 acres. The Corporation was to supply the seed, pesticides and herbicides. After the harvest, the contracts required the Corporation to pick up the sunflower seed from the Neiberts' storage facilities. The Corporation was to pick up all of the seed by October 30, 1986. The contracts provided the Neiberts would be paid 12¢ per pound for all seeds over $17/64$ of an inch in size.

Harvesting commenced in late August of 1986 and was completed around September 10. The record shows the first truckload of seed was picked up on September 4. After four loads had been picked up and delivered to the processing facilities, the Corporation made its first payment to the Neiberts. According to Joyce Neibert, the Neiberts received the first payment on September 18. They were surprised by the amount of small seed for which they did not receive any payment. They immediately called Steve Schwenn, president of the Corporation, to complain. They informed Schwenn they would not allow any more seed to be picked up until the problem was resolved. By this point a total of eight loads had been shipped.

On September 24, 1986, the Neiberts flew to Fargo, North Dakota, the headquarters of the Corporation. On the morning of September 25, 1986, the Neiberts met with Schwenn. A series of meetings took place over the course of the day on September 25 and on the morning of September 26, 1986. At the conclusion of the last meeting, the parties spoke with Robert Watts, the trucker, and informed him the dispute had been resolved and deliveries would resume.

The Neiberts testified the parties had agreed to amend the Production Agreements to pay the Neiberts 10¢ per pound for the small seed. However, Schwenn testified he had agreed to review the financial as-

pects to see if it was economical to amend the contracts to pay for the small seed. He had agreed to pay for the small seed contained in the loads already delivered. He also paid the Neiberts for the small seed contained in the shipment picked up immediately after the meetings in Fargo.

A draft amendment was drawn up; however, on October 24, 1986, Schwenn informed the Neiberts by letter that he could not afford to pay them for the small seed, and that he would have to stick to the terms of the original contracts. Schwenn and his wife also placed a call to the Neiberts on Sunday, October 26, 1986. Sue Schwenn questioned the Neiberts about whether the Neiberts were calling other buyers for the seed. The Schwenns both testified that the Neiberts told them no more seed would be shipped. The Neiberts denied making such a statement.

In November and December of 1986 there were further contacts between the parties. The record makes reference to the Neiberts' request, in November of 1986, for guarantees of payment. The Corporation picked up a portion of the remaining seed during the period from December of 1986 to February of 1987. According to the evidence presented at trial, approximately 472,600 pounds of seed were sold to other buyers or used as livestock feed by the Neiberts.

On March 19, 1987 the Neiberts brought an action for breach of contract against the Corporation, and the Corporation filed a counterclaim also alleging breach of contract. Following a bench trial and a hearing on damages, the trial court entered judgment for the Corporation on the counterclaim. Regarding the conflicting evidence, the trial court found the Corporation's version of events to be more credible. The trial court awarded the Corporation damages in the amount of $22,450.23. The Neiberts appealed.

On appeal, the Neiberts contend the trial court erred in finding they breached the contracts, and in finding the contracts were not modified following the meeting in Fargo.

The issue as to which party breached the contract is a question presented to the trier of fact, and its finding will not be disturbed unless it is contrary to the manifest weight of the evidence. (*F.E. Holmes & Son Construction Co. v. Gualdoni Electric Service, Inc.* (1982), 105 Ill. App. 3d 1135, 435 N.E.2d 724.) The trial judge, as the trier of fact, is in a position superior to a court of review to observe the demeanor of witnesses while testifying, to judge their credibility and to determine the weight their testimony should receive. (*Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 382 N.E.2d 1205.) Consequently, where the testimony is conflicting in a bench trial, the court's findings will not be disturbed un-

less they are against the manifest weight of the evidence. *In re Application of the County Treasurer* (1989), 131 Ill. 2d 541, 546 N.E.2d 506.

■ In the instant case, the testimony regarding the statements and actions of the parties during the autumn of 1986 was contradictory. On review of the record, we cannot say the trial court's finding that the Neiberts breached the Agreements was against the manifest weight of the evidence. The record supports the trial court's finding that the Neiberts' actions surrounding their attempt to reform the Agreements "contributed significantly" to the failure of the Corporation to pick up the seed within the time specified in the Agreements.

■ In addition, we cannot say the trial court erred in finding the Agreements were not modified following the Fargo meeting. The trial court found Steve Schwenn's version of events more credible. Given the conflicting testimony as to what was agreed to at the Fargo meeting, it was within the province of the trial court to determine which testimony it found most credible. We note that amendments to the Agreements were required to be in writing and signed by both parties. No written amendment was ever entered into by the parties, although a draft was prepared. In sum, the trial court's findings that the Neiberts breached the Production Agreements and that the Agreements were not modified were not against the manifest weight of the evidence.

The Neiberts also contend the trial court erred in assessing damages. The trial court found the Corporation's argument concerning damages was supported by the record, and adopted the Corporation's calculation of damages with some modifications.

In assessing damages, the trial court multiplied the number of pounds of seed not delivered to the Corporation (472,600) by 17¢, for a total of $80,352.20. The 17¢ figure was derived from one of the contracts the Corporation had with a party who was buying seed from the Corporation. After making certain allowances for small seeds, and subtracting what the Corporation would have to pay the Neiberts at 12¢ a pound, the base figure for the Corporation's damages was $34,057.99.

The trial court then subtracted $8,102.16, representing the value of three loads of seed the Corporation had picked up and not yet paid for. The court also credited the Neiberts $671.60 for costs owed to them by the Corporation. This figure was derived from the court's finding that the Corporation owed the Neiberts $4,500 for a chemical carrying the brand name Lasso which was sprayed on the sunflowers. From this $4,500, the trial court subtracted $1,300 for extra seed which the Neiberts obtained from the Corporation and $2,528.40 for the herbicide, Ambien, which the Corporation supplied and paid for, but was used at a rate in excess of the recommendation of Steve Schwenn. The trial court

also subtracted from the Corporation's award $2,834, representing what it would cost to ship the 472,600 pounds of seed from the Neiberts' farm to processing facilities in Joliet, Illinois. This left a sum of $22,450.23 owed to the Corporation by the Neiberts.

The Neiberts challenge numerous aspects of the trial court's damage calculation, including the use of the 17¢ figure in valuing the seed not delivered to the Corporation. We agree the trial court erred in using the 17¢ figure, but for reasons other than those raised by the Neiberts.

In pertinent part, section 2—711 of the Uniform Commercial Code—Sales (the Code) (Ill. Rev. Stat. 1989, ch. 26, par. 2—711(1)) provides:

> "(1) Where the seller fails to make delivery or repudiates *** then with respect to any goods involved, ***, the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid
>
> (a) 'cover' and have damages under the next section as to all goods affected whether or not they have been identified to the contract; or
>
> (b) recover damages for non-delivery as provided in this Article (Section 2—713)."

Section 2—712 (Ill. Rev. Stat. 1989, ch. 26, par. 2—712) provides:

> "(1) After a breach within the preceding section the buyer may 'cover' by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.
>
> (2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2—715), but less expenses saved in consequence of the seller's breach.
>
> (3) Failure of the buyer to effect cover within this Section does not bar him from any other remedy."

Regarding the buyer's damages for nondelivery, section 2—713 (Ill. Rev. Stat. 1989, ch. 26, par. 2—713) provides:

> "(1) Subject to the provisions of this Article with respect to proof of market price (Section 2—723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article (Section 2—715), but less expenses saved in consequence of the seller's breach.

(2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance as of the place of arrival."

Under the provisions of the Code, in a breach by the Neiberts, the Corporation had the option of effecting "cover" and retrieving the resulting loss under section 2—712, or recovering damages pursuant to section 2—713. The comments to section 2—713 state that the remedy provided by section 2—713 is completely alternative to the option to cover, and that the section only applies when and to the extent the buyer has not covered. Ill. Ann. Stat., ch. 26, par. 2—713, Uniform Commercial Code Comment, at 565 (Smith-Hurd 1963).

■ In the instant case, we find the record shows the Corporation elected to effect cover when it could not obtain the seed it needed from the Neiberts in September of 1986. Steve Schwenn testified it was his intention to fill a contract he had with a repurchaser, Dahlgren, with the seed he received from the Neiberts. Under the Dahlgren contract, Dahlgren paid 17¢ per pound for 1 million pounds of seed. The Neiberts raised approximately 1 million pounds of sunflower seed. Schwenn testified that after the Neiberts refused to ship any more seed, he filled the Dahlgren contract with seed obtained from other contract growers. He also bought seed from a third party at 11.66¢ to 11.8¢ per pound. The contract was filled by October 6, 1986. Schwenn did not testify that he could not fill the contract with Dahlgren because the Neiberts breached the Agreements.

We recognize the Corporation had a number of sources for seed and would utilize those sources which were the most economical. This might mean that the Neiberts' seed could have been used to fill other obligations. However, the Corporation is bound by its assertions at trial. Schwenn claimed the Neibert seed was to be used to fill the Dahlgren contract. When that seed became unavailable, he switched to other sources and was able to cover the Dahlgren obligation. Thus, under the circumstances presented, the proper measure of the Corporation's damages was the difference between the cost of cover, *i.e.*, the cost of buying other seed in the market to fill the Dahlgren contract, and the 12¢ per pound to be paid to the Neiberts under the Purchase Agreements.

Therefore, the trial court erred in adopting the Corporation's method of calculating this part of its damages. The cause must be remanded for an appropriate determination of the Corporation's damages. The Corporation will have to show what it paid to purchase substitute seed to fill the Dahlgren contract and whether it incurred any loss therefrom.

We also address the other challenges the Neiberts raise to the trial court's damage calculation as they may arise on remand. The Neiberts contend the trial court erred in determining trucking cost on the nondelivered seed. This aspect of the damages is tied to the cost of purchasing substitute seed to fill the Dahlgren contract and will have to be taken into consideration on remand.

The Neiberts contend there was no basis for crediting the Corporation $1,300 for the cost of 10 bags of planting seed. The record shows the Corporation originally supplied the Neiberts with 96 bags of seed, which according to Steve Schwenn was sufficient to plant the 612 acres. Without notifying Schwenn, Richard Neibert obtained an additional 15 bags from Schwenn's father-in-law, which Neibert claimed he used for replanting. Neibert's field records indicate he replanted 35 to 40 acres. Schwenn testified it would take approximately five bags to replant that amount of acreage. We find the record adequately supports the trial court's finding that Neibert obtained 10 bags of seed in excess of his planting and replanting needs.

The Neiberts also assert the trial court erred in crediting the Corporation $2,528.40 for Ambien herbicide. Schwenn recommended Ambien be used at a rate of 1.8 pounds per acre. The vendor recommended 2.2 to 3.6 pounds per acre. Neibert's records show he used 2.2 to 2.4 pounds per acre. We note the Purchase Agreements required Neibert to follow the vendor's recommendation. Neibert's application of the Ambien was within the vendor's recommended amount. The Neiberts were acting within the requirements of the Purchase Agreements in using the Ambien. Therefore the trial court's finding on this issue is against the manifest weight of the evidence.

Finally, both parties agree the cost of Lasso to be credited the Neiberts is $5,087.25 rather than the $4,500 found by the trial court.

For the foregoing reasons, the judgment of the circuit court of Iroquois County on the issue of liability is affirmed. The damage award is reversed and the cause remanded for a determination of damages consistent with this opinion.

Affirmed in part; reversed in part and remanded.

BARRY and McCUSKEY, JJ., concur.