**CHRONISTER OIL COMPANY, Plaintiff–Appellant,**

v.

**UNOCAL REFINING AND MARKETING (UNION OIL COMPANY OF CALIFORNIA), Defendant–Appellee.**

No. 93–3940.

United States Court of Appeals, Seventh Circuit.

Argued May 20, 1994.

Decided Sept. 1, 1994.

Gordon W. Gates (argued), Londrigan, Potter & Randle, Springfield, IL, for plaintiff-appellant.

Richard E. Stites (argued), Thomas B. Borton, and Kevin W. Brennan, Livingston, Barger, Brandt & Schroeder, Bloomington, IL, for defendant-appellee.

Before POSNER, Chief Judge, and EASTERBROOK and ROVNER, Circuit Judges.

POSNER, Chief Judge.

Chronister Oil Company brought this diversity suit for breach of contract against Union Oil Company (Unocal), to which Chronister had agreed to sell 25,000 barrels of gasoline. Unocal counterclaimed, charging that it was Chronister, not Unocal, that had broken their contract. The case is governed by the Uniform Commercial Code as interpreted by the Illinois courts; and the magistrate judge, to whom the case was assigned for trial by consent of the parties, held after a bench trial that Chronister had broken the contract, and he awarded damages of $26,000 to Unocal, precipitating this appeal.

The contract, made February 9, 1990, provided that Chronister, an oil trader, would deliver the 25,000 barrels to Colonial Pipeline

(for shipment to Unocal) on the "front seventh cycle," and fixed a price of 60.4¢ a gallon. The term "front cycle" is pipelinese for the first half of what is normally a ten-day period for shipping a particular grade of product in a petroleum pipeline. The cycles begin on January 1, so the "front seventh cycle" would be approximately the first five days of March—apparently no effort is made to pin down the dates of the cycles and half cycles more precisely. To fulfill the contract, Chronister on March 1, 1990, made a contract with another oil trader, Enron, which in turn made a contract with a supplier, Crown Petroleum, to deliver the 25,000 barrels to Colonial Pipeline's pipeline at Pasadena, Texas for shipment east and north to terminals from which Unocal would deliver the gasoline to its dealers. Enron decided to have the gasoline delivered to Colonial's pipeline on March 5. But when the day arrived and Colonial tested the gasoline preparatory to taking it into its pipeline, it found that the gasoline contained too much water, and refused to take it. Unocal was informed on the morning of March 6 (which apparently was still within the front seventh cycle) and immediately called Chronister, demanding (at least implicitly, as we'll explain) assurances that Chronister would comply with the contract. Chronister got in touch with Enron, which agreed to supply another 25,000 barrels, but for shipment on the back seventh cycle, that is, later in March, or on the eighth cycle, later still. Unocal wasn't interested, and within hours, while Chronister was trying to solve the problem, Unocal took the precaution of diverting 25,000 barrels of gasoline that it already owned and that were in the pipeline in transit to a storage facility to Baton Rouge to its distribution terminals farther up the line—a measure Unocal describes as "provisional cover"—in effect supplying the 25,000 barrel deficit from inventory, but giving Chronister until the following day (March 7) to come up with conforming product.

Yet later the same day (March 6), Chronister, despite Unocal's adamant refusal to accept anything but front seventh cycle gasoline, accepted Enron's offer of substitute performance on the back seventh cycle and again offered this to Unocal. Again Unocal insisted that it would take only front seventh cycle product—either the Crown Petroleum gasoline drained of its water or other product that could be injected into the pipeline in time. With Unocal unwilling to accept the 25,000 barrels on the back seventh cycle that Chronister had perhaps precipitately agreed to take from Enron, Chronister sold this gasoline to another company, Aectra Refining, at 55.3¢ a gallon. Claiming that by refusing to accept the substitute performance Unocal had broken the contract, Chronister filed this suit for damages based on the difference between the contract price and the lower price at which it sold the 25,000 barrels to Aectra. Unocal counterclaimed, contending that it was Chronister that had broken the contract and seeking damages equal to the difference between the contract price and the average cost of its inventory (63.14¢), from which it had made up the loss of the 25,000 barrels promised by Chronister. The district court agreed with Unocal that Chronister, not Unocal, had broken the contract, and it awarded damages to Unocal on its counterclaim.

■ Chronister's appeal makes no reference to Unocal's alleged breach or to any damages sustained by Chronister as a result of that breach; we may assume that this claim has been abandoned and that all Chronister wants us to decide is that it did not break the contract or that if it did, Unocal sustained no damages. We agree with the second point but not the first. The contract specified delivery on the front seventh cycle and Chronister could not deliver then because of the water in the gasoline. It argues that if Unocal hadn't pulled the plug on it at 10:30 a.m. on March 6 it would have found a way to meet its contractual obligations, whether by draining the excess water from Crown's gasoline, or by delivering gasoline to entry points to the pipeline closer to Unocal's terminals, or even by buying gasoline from Unocal! But Unocal informed Chronister that Unocal's action in "covering" (as Unocal calls it, erroneously as we shall see) its loss out of inventory was provisional until March 7 and would be rescinded if Chronister could deliver 25,000 barrels of gasoline to the pipeline by then; and thus

forced to put up or shut up, Chronister shut up. Because oil companies that market their product through retail dealers, like Unocal, try to minimize the amount of inventory that they must hold against possible supply interruptions yet dare not find themselves unable to supply their dealers, a failure to deliver gasoline to such companies in timely fashion cannot be thought an immaterial breach. The fact that Chronister was not responsible for the water in the gasoline is of no significance. Liability for breach of contract is normally and here strict liability.

Chronister argues that if Unocal wanted assurances of performance it had to ask for them in writing, UCC § 2–609, and it did not. The only assurances sought were oral, and indeed implicit—Unocal informing Chronister of the failure of delivery and giving it a day to solve with the problem, with the clear implication that if Chronister could not solve it within that time it would be in breach and Unocal would terminate. This was "demand" enough, but section 2–609 states that a party "may *in writing* demand" assurances. Although a number of cases, including Illinois cases and Seventh Circuit cases interpreting Illinois law, waive the requirement when the party on whom the demand is made knows that it has been made, e.g., *Toppert v. Bunge Corp.*, 60 Ill.App.3d 607, 18 Ill.Dec. 171, 377 N.E.2d 324, 328–29 (1978); *AMF, Inc. v. McDonald's Corp.*, 536 F.2d 1167, 1170–71 (7th Cir.1976) (applying Illinois law); *Diskmakers, Inc. v. DeWitt Equipment Corp.*, 555 F.2d 1177, 1179–80 (3d Cir.1977), the most recent Illinois cases insist on strict compliance with the terms of the section. *Bodine Sewer, Inc. v. Eastern Illinois Precast, Inc.*, 143 Ill.App.3d 920, 97 Ill.Dec. 898, 905, 493 N.E.2d 705, 712 (1986); *Canteen Corp. v. Former Foods, Inc.*, 238 Ill.App.3d 167, 179 Ill.Dec. 342, 352, 606 N.E.2d 174, 184 (1992).

■ But all this is irrelevant. The UCC's provision on assurances comes into play only when one party suspects that the other may break the contract when the other's performance comes due. See UCC § 2–609, official comment 1; *Central Oil Co. v. M/V Lamma–Forest*, 821 F.2d 48, 51 (1st Cir.1987); James J. White & Robert S. Summers, *Uniform Commercial Code* § 6–2, pp. 208–15 (2d ed.

1980). If back in February, well before Chronister was due under the contract to deliver the 25,000 barrels to Colonial Pipeline for shipment to Unocal, Unocal had learned things that made it reasonably doubt that Chronister would fulfill its obligations under the contract, it could have demanded adequate assurances of timely performance and if it failed to receive them could then have taken appropriate measures of self-help, such as terminating the contract and obtaining substitute performance elsewhere. By 10:30 a.m. on March 6, or on the latest by the end of that day or the beginning of the next (which probably fell outside the front seventh cycle), Unocal knew that Chronister had broken the contract; and by then assurances were a moot point because Chronister had broken the contract, being utterly unable to make delivery before the back seventh cycle. This is not a case in which, fearing an imminent breach, a party terminates the contract without satisfying the requirements of the UCC's provision on assurances, and thus prematurely. By the time Unocal gave up on Chronister, on March 7, and made its "provisional cover" final, the contract had already been terminated by Chronister's breach, an accomplished rather than anticipated breach.

■ We move to the issue of damages. The point of an award of damages, whether it is for a breach of contract or for a tort, is, so far as possible, to put the victim where he would have been had the breach or tort not taken place. *Nicolet Instrument Corp. v. Lindquist & Vennum*, 34 F.3d 453, 457 (7th Cir.1994). Unocal had, back in February, promised to pay Chronister 60.4¢ a gallon. By the first week of March the price of gasoline for delivery to the Colonial Pipeline had fallen. On March 6, Chronister sold 25,000 barrels to Aectra at 55.3¢ a gallon, and it is not argued that Chronister could have gotten a higher price. Uncontradicted evidence revealed that there had been a similar sale at a similar price on March 2. Had Unocal gone out in the market and covered by buying 25,000 barrels on March 6 or 7 it would have paid somewhere in the neighborhood of 55¢ a gallon and thus would have *saved* 5¢ a gallon as a result of Chronister's breach. It makes no difference that instead

of buying the gasoline on the open market it took it from inventory. As a matter of fact, because of an impending change in pressure by Colonial Pipeline that would make Unocal's inventory, stored mainly in a 300,000 barrel storage facility in Baton Rouge, shortly unshippable, Unocal had a strong interest in drawing down its inventory. The breach was a godsend. At argument Unocal's counsel candidly acknowledged that Unocal was made better off as a result of the breach and that this was evident not only by the time of trial, and hence early enough to figure in the calculation of damages, *Rea v. Ford Motor Co.*, 560 F.2d 554, 557 (3d Cir.1977), but within fifteen days after Chronister's breach.

Nevertheless, argues Unocal, it was entitled by UCC § 2–712 to cover by obtaining a substitute for the lost 25,000 barrels, even from itself, and to obtain as damages the difference between the cover price, which it deems to be 63.14¢ a gallon, the average cost of the inventory from which it obtained the substitute supply of gasoline, and the contract price of 60.4¢. This is a misreading of section 2–712, as the only two Illinois-law cases pertinent to the issue hold. *Draper v. Minneapolis–Moline, Inc.*, 100 Ill.App.2d 324, 241 N.E.2d 342, 345 (1968); *Rash Ranco Corp. v. B.L.B. Inc.*, 762 F.Supp. 1339, 1341 (N.D.Ill.1991). Section 2–712 defines cover as purchasing or making a contract to purchase a substitute good. Unocal did not purchase any gasoline to take the place of the lost 25,000 barrels. It decided *not* to purchase a substitute good but instead to use a good that it already owned. You can't "purchase," whether in ordinary language or UCC speak (see § 1–201(32)), what you already own. The purpose of the cover provision is not to allow buyers to obtain damages when they have not been hurt, but to provide a market measure of the hurt. Taking a good out of your inventory and selling it is not a purchase in a market. There is no purchase price to use as a ready index of the harm that the buyer incurred by the seller's breach.

Two cases from other jurisdictions have shoehorned this kind of "self-cover" into section 2–712. *Cives Corp. v. Callier Steel Pipe & Tube, Inc.*, 482 A.2d 852, 858 (Me.1984); *Dura–Wood Treating Co. v. Century Forest Industries, Inc.*, 675 F.2d 745, 753–54 (5th Cir.1982). They had no need to do this violence to the text. Section 2–712 is not the only buyer's remedy that the UCC authorizes. The very next section allows the buyer to obtain damages measured by the difference between market price and contract price. If a reasonable response for the buyer to the breach would be to make the product itself, then the difference between the market price of that product and the contract price would be an appropriate measure of the harm from the breach. *Neibert v. Schwenn Agri–Production Corp.*, 219 Ill.App.3d 188, 161 Ill.Dec. 841, 845, 579 N.E.2d 389, 393 (1991); *URSA Farmers Cooperative Co. v. Trent*, 58 Ill.App.3d 930, 16 Ill.Dec. 348, 350–51, 374 N.E.2d 1123, 1125–26 (1978). That is what *Cives* and *Dura–Wood* hold; they merely cite the wrong section.

Unocal's response in diverting gasoline in transit to storage was reasonable; the only question, upon which its damages if any turn, is what that cost it. What it had paid for the gasoline—even less, the *average* price that it had paid for *all* the gasoline that it had not yet sold (the average cost of its inventory, in other words)—was not the cost of diverting the gasoline from storage to sale. At least it was not cost in a sense relative to damages. The object of an award of damages, as we have already noted, is to put the victim in the same place that he would have been in had the breach or other wrong of which he complains not occurred. It is to compensate him for a loss *that he would have avoided* had the violation not occurred. The concept of loss that underlies the computation of legal damages thus resembles the economist's concept of "opportunity cost": the opportunity one gives up by engaging in some activity is the cost of that activity, *Afram Export Corp. v. Metallurgiki Halyps, S.A.*, 772 F.2d 1358, 1369–70 (7th Cir.1985). We must ask what Unocal gave up as a consequence of the breach, and whether it was something of value.

By diverting the gasoline in order to protect itself against Chronister's breach of contract, Unocal gave up the opportunity either

to sell the gasoline on the market (in order to lighten its inventory), which we know would have yielded it substantially less than the average cost of its inventory because the market price was much lower than that cost, or to have a larger—an unnecessarily and, it would soon prove, unusably larger—inventory. Neither course of action would have yielded value equal to Unocal's average cost of inventory or equal to the contract price. The first point shows that the average cost of inventory was the wrong figure to use in estimating Unocal's damages, and the second point shows that it had no damages. The 25,000 barrels it diverted to its dealers cost it less—was worth less—than the 25,000 barrels that Chronister failed to deliver to it as promised. Sellers usually break their contracts in a rising market, where they can get more for the product by selling to someone other than the buyer with whom they signed the contract. Here a seller in a declining market broke a contract that he desperately wanted to perform, conferring a windfall gain on the buyer—which the latter would like as it were to double with the help of the courts.

The judgment of the district court is affirmed insofar as it determined that Chronister broke its contract with Unocal. But it is reversed with respect to damages and remanded with directions to enter judgment for Unocal for nominal damages (to which for reasons we do not understand every victim of a breach of contract, unlike a tort victim, is entitled, *Stromberger v. 3M Co.*, 990 F.2d 974, 976 (7th Cir.1993)) only.

AFFIRMED IN PART, REVERSED IN PART.