107 F.3d 466
 36 Fed.R.Serv.3d 1314, RICO Bus.Disp.Guide 9210,
Pens. Plan Guide (CCH) P 23936J
 Diana MIRA, Delores G. Mira and James O. Mira, individually
and on behalf of all those similarly situated,
Plaintiffs-Appellants,
v.
NUCLEAR MEASUREMENTS CORPORATION, Larry Vaughn, Donald L.
DeMoss, Joyce M. Kramer, and other as-yet-unknown
individuals, plan administrators,
trustees and fiduciaries, et
al., Defendants-Appellees.
 No. 95-2122.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 3, 1996.
Decided Feb. 14, 1997.
 
 A. Luis Ortiz, Richard Loiseau (argued), Indianapolis, IN, for Diana Mira.
 Richard Loiseau, Indianapolis, IN, for Delores G. Mira, James O. Mira.
 Daniel C. Emerson, Scott A. Weathers (argued), David C. Milne, Bose, McKinney & Evans, Indianapolis, IN, for Nuclear Measurements Corporation, Larry Vaughn, Donald L. DeMoss, Joyce M. Kramer.
 Before COFFEY, MANION and KANNE, Circuit Judges.
 COFFEY, Circuit Judge.
 
 
 1
 Diana Mira and her children, James and Delores, brought suit against Nuclear Measurements Corporation ("NMC") and three of its officers, seeking to recover damages for the defendants' alleged breach of fiduciary duties as the administrators of an employee benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001 et seq. ("ERISA"). The plaintiffs also asserted a claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962 and 1964(c) ("RICO"), alleging that the defendants engaged in a pattern of racketeering activity with multiple violations of Title 18 U.S.C. § 664. The district court granted summary judgment in favor of the defendants with respect to both the ERISA breach-of-fiduciary-duty claim and the RICO claim, and shortly thereafter denied the Miras' motion for class certification, pursuant to Federal Rule of Civil Procedure 23(c). We affirm.
 
 I. BACKGROUND[1]
 
 2
 A. Diana Mira and the NMC Employee Benefit Plan
 
 
 3
 The defendant corporation NMC, located in Indianapolis, Indiana, is a small company with fewer than two-dozen employees which manufactures instruments that detect and measure radiation. These devices are used by the U.S. Department of Energy Laboratories as well as various commercial nuclear power facilities to protect their workers through the monitoring of possible releases of radiation into the environment.
 
 
 4
 NMC was owned by defendants Larry Vaughn and Donald L. DeMoss, who also served as NMC's Chairman and President respectively. Defendant Joyce M. Kramer was NMC's Vice President of Operations and Human Resources Director. In addition to being officers of the company, DeMoss, Vaughn, and Kramer were salaried employees and participated in the firm's employee benefit plan ("the plan"), which is governed by ERISA.
 
 
 5
 Beginning in 1989, Diana Mira worked as a solderer in the wiring department at NMC, earning approximately $5 an hour. She participated in the company's employee benefit plan, which provided health insurance for herself and her children, and her children were plan beneficiaries as defined by 29 U.S.C. § 1002(8). The defendants, through a firm known as Acordia Small Business Benefits, Inc. ("Acordia"), purchased health insurance coverage for its employees through Blue Cross/Blue Shield of Indiana. The defendants, as plan administrators, were obligated to forward the health insurance premiums to Acordia, in a timely fashion, on behalf of the plan's participants and beneficiaries in order to maintain the health insurance coverage agreed upon. NMC contributed two-thirds of each employee's monthly health insurance premium, while each employee was expected to contribute the remaining third. The employees' contributions were paid through deductions from their weekly paychecks (in Mira's case, $26.58 per week for health insurance coverage for herself and her family).
 
 
 6
 During May, June, July, August, and September of 1992, NMC encountered serious financial difficulties and, instead of applying the employees' payroll deductions to the health insurance premiums as it was obligated to do, the company used all of its available funds to cover day-to-day operating expenses. As DeMoss explained in his deposition, "Our company was suffering extreme cash flow problems at the time. In fact, we were having trouble making payroll. I elected--I knew we were going to pay [the premiums], that [they] would be paid. I elected not to lay anyone off, to try to keep everyone working and to stretch this out as long as I could." DeMoss' strategy was to keep the company afloat by giving priority to the payment of the day-to-day operating expenses of the company.
 
 
 7
 On September 2, 1992, Acordia notified NMC that its employees' group insurance coverage had been canceled, effective May 1, 1992, as a result of NMC's non-payment of premiums since May 1992 or earlier. NMC, through DeMoss and Kramer, took steps to ensure that the past-due amounts would be paid and employee insurance coverage reinstated. DeMoss testified that NMC was "trying like hell to get [the past-due premiums] paid." He explained: "We expended extraordinary effort to get things out the door. That means labor ... working overtime, working weekends, whatever it took to get it out the door, to get the monies in." As of early September, however, neither Acordia nor NMC had notified Mira or any of NMC's other employees about the insurance coverage crisis.
 
 
 8
 On September 8, 1992, shortly after NMC learned of the lapse of health insurance coverage from Acordia, Diana Mira received a claim denial letter from Blue Cross/Blue Shield of Indiana informing her that her health insurance coverage had been canceled due to NMC's failure to pay premiums and that the health insurance coverage had not been in effect in July 1992, at which time she incurred $101 worth of medical services for her daughter Delores. On September 14, Mira met with an Indianapolis attorney to discuss the matter of the unpaid health care insurance premiums. Mira's attorney contacted Joyce Kramer, NMC's Vice President of Operations, to discuss the situation, and Kramer assured the attorney that the unpaid premiums would be paid, that health insurance coverage would be reinstated by September 15, and that all claims for past medical expenses would be paid retroactive to May 1, 1992. Mira's attorney memorialized his client's position in a letter protesting the lapse of insurance coverage. His letter claimed that Mira was being "threatened [with] suit on unpaid medical expenses," and warned that if Mira's medical bills were not paid by September 30, legal action would follow.
 
 
 9
 On September 15, the day after meeting with her attorney, Mira returned to her place of employment. NMC had been notified by Acordia that all of its employees would be required to execute a Blue Cross/Blue Shield reinstatement form before the insurer would agree to reinstate health insurance coverage for the plan participants. Joyce Kramer, NMC's Human Resources Director, requested that Mira complete one of these forms. When Mira refused to do so, Kramer informed her that filling out the form was required and that Mira could not continue working until the necessary paperwork was submitted. This agitated Mira, who (according to the defendants) became loud and disruptive and repeatedly asked if she was being "fired." Kramer finally told Mira to "go home until things are resolved." Mira refused to return to work at NMC. At this juncture, NMC informed its other employees for the first time that the health insurance had lapsed and that the company was taking the necessary steps to have the coverage reinstated.
 
 
 10
 After Mira had been absent from work for several days, Kramer informed her by letter that she could return to work as soon as the reinstatement form was completed and returned. Separately, NMC's counsel forwarded a letter to Mira's counsel, dated September 25, 1992, which advised that Mira's employment had not been terminated and stated that Mira's "only hope of reinstating her insurance is to fill out those forms," noting that the "reinstatement forms for the balance of the NMC employees ha[d] already been completed and submitted to the insurer." Although NMC had thus made it very clear that Mira was welcome to return to her job upon completion of the necessary paperwork, Mira not only refused to complete the reinstatement form, but also remained away from work and applied for state unemployment benefits, which were denied after the Indiana Department of Employment and Training Services determined that Mira "was not discharged" by NMC. As far as we are able to determine from the record, Mira has to date failed to offer any explanation for her unwillingness to complete these forms and/or return to work at NMC.
 
 
 11
 Notwithstanding Mira's failure to complete a reinstatement form, NMC paid all of the past premiums due and all of the employees' health insurance coverage (including Mira's) was reinstated retroactive to May 1, 1992. Thus, all of Mira's claims were paid in full. NMC learned that its employees' health insurance coverage had been reinstated on November 2, 1992, and there is no evidence in the record that Mira had to wait for an undue amount of time before having her claims paid by Blue Cross/Blue Shield. In spite of receiving full payment, Mira opted to pursue this litigation against NMC.
 
 B. District Court Proceedings
 
 12
 The Miras filed this action on April 5, 1993 and amended the original complaint on April 29, 1993, setting forth five causes of action: (1) interference with the Miras' ERISA rights, in violation of 29 U.S.C. § 1140, (2) a civil RICO claim based on alleged violations of Title 18 U.S.C. § 664, (3) a state-law claim under Indiana Code § 34-4-30-1 (which permits victims of property crimes to recover civil damages), (4) breach of fiduciary duties imposed by ERISA, 29 U.S.C. § 1104, and (5) an action for punitive damages based on the defendants' allegedly "reckless," "wanton," "willful," and "malicious" termination of Mira.
 
 
 13
 Each of the parties to the litigation filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). On June 6, 1994, the district court denied the Miras' motion, and granted the defendants' summary judgment motion with respect to all of the claims except for the plaintiffs' interference with ERISA rights claim,[2] which it referred to a magistrate judge for trial.[3]
 
 
 14
 After the court ruled on the summary judgment motions, it issued a separate order (dated June 6, 1994) denying the Miras' motion for class certification pursuant to Federal Rule of Civil Procedure 23(c). The court reasoned that its disposition of the summary judgment motions left only the interference with ERISA rights claim, an individual cause of action brought on behalf of Diana Mira only, and thus denied class certification. The plaintiffs moved for reconsideration of the denial of the class-certification motion on June 13, 1994 and the court denied the motion two days later.
 
 
 15
 On November 28, 1994, following a bench trial, the magistrate judge found in favor of the defendants on Mira's interference with ERISA rights claim, concluding that none of NMC's actions were "taken for the purpose of or with the intent to interfere with any of [Mira's] rights under the employee benefit plan or to retaliate against her for exercising those rights." After the entry of final judgment on the interference with ERISA rights claim, the plaintiffs filed a notice of appeal in this court. The appellants do not challenge the magistrate judge's ruling on the interference with ERISA rights claim; instead, they assign as error the trial court's denial of their motion for summary judgment and the denial of their motion for class certification.
 
 II. ISSUES
 
 16
 The questions presented are: (1) whether the district court erred in granting summary judgment for the defendants on the Miras' ERISA breach of fiduciary duty claim, (2) whether the district court erred in granting summary judgment for the defendants on the Miras' RICO claim, and (3) whether, under Federal Rule of Civil Procedure 23, it was proper for the district court to rule on the Miras' motion for class certification after it decided the summary judgment motions.
 
 III. DISCUSSION
 A. Standards of Review
 
 17
 The appellants challenge the district court's grant of summary judgment in favor of the defendants on their ERISA breach of fiduciary duty and RICO claims. "We review the district court's grant of summary judgment de novo, drawing all reasonable inferences from the record in the light most favorable to the non-moving party." Johnson v. Runyon, 47 F.3d 911, 917 (7th Cir.1995) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986)). A trial judge will grant a motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "If no reasonable jury could find for the party opposing the motion, it must be granted." Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir.1995) (citing Anderson, 477 U.S. at 248, 106 S.Ct. at 2509-10). "Conclusory allegations by the party opposing the motion cannot defeat the motion." Id.
 
 
 18
 While the summary judgment standards set forth above govern two of the three issues presented on appeal, we review the district court's decision to deny class certification for an abuse of discretion. Retired Chicago Police Ass'n v. City of Chicago, 7 F.3d 584, 596 (7th Cir.1993).
 
 B. Breach of Fiduciary Duty Under ERISA
 
 19
 The first issue before the trial court on summary judgment was whether the plaintiffs could recover from NMC and its officers for breaching fiduciary duties imposed by §§ 404 and 409 of ERISA. 29 U.S.C. §§ 1104 and 1109. An ERISA fiduciary (i.e., one who is entrusted with plan assets) owes duties of loyalty and care to the plan. He or she must "discharge his [or her] duties with respect to [the] plan solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). Additionally, an ERISA fiduciary is obligated to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).
 
 1. The Defendants' Conduct
 
 20
 The dire financial circumstances facing NMC between May and September of 1992 does not excuse the defendants' failure to pay the health insurance premium payments, nor does it justify the company's failure to timely inform employees of the lapse in their insurance coverage. We are of the opinion that this conduct was a violation of the "duty of care" standard, for the defendants, as fiduciaries, owed to the plan participants and beneficiaries a duty to act with the "care, skill, prudence and diligence" of a "prudent man acting in a like capacity." 29 U.S.C. § 1104(a)(1)(B). Indeed, the defendants conceded at oral argument in this case that their actions represented a "breach of trust." Nevertheless, for reasons explained herein, we agree with the district court's finding that because the plan and its participants and beneficiaries suffered no harm, i.e., no economic loss, "it is irrelevant whether the defendants did in fact breach their fiduciary duty."
 
 
 21
 2. Economic Loss: "No Harm, No Foul?"
 
 
 22
 Initially, the plaintiffs argue that a showing of economic loss is not required as a condition of recovery for breach of fiduciary duty under ERISA, relying upon Leigh v. Engle, 727 F.2d 113 (7th Cir.1984). Since Leigh is factually and legally distinguishable from the case before us, we believe that the Miras' reliance on this case is misplaced. In Leigh, this court held that the various defendants (ERISA fiduciaries) had breached fiduciary duties owed to the beneficiaries of a sizeable employee profit-sharing trust and could be held liable under ERISA, even though the defendants' actions had not resulted in a financial loss to the trust. The investment activities challenged by the plaintiffs in Leigh, far from harming the trust financially, "produced in the aggregate the extraordinary return on investment of 72%, exclusive of dividends." Id. at 121. Nevertheless, this court held that by investing the trust's assets in various companies in which the fiduciaries had a personal stake, the fiduciaries breached their duty of loyalty, i.e., ERISA's requirement that those who control employee benefit plans act "solely in the interest" of plan beneficiaries and "for the exclusive purpose of providing benefits." Id. (quoting 29 U.S.C. § 1104(a)(1)). The court allowed recovery under ERISA--even though the trust suffered no financial loss--because the fiduciaries had clearly breached the duty of loyalty they owed to the beneficiaries. By contrast, the defendants here did not put the plan at risk for their own personal gain or benefit; rather, they used the funds that should have been applied to pay the insurance premiums for the day-to-day expenses that were necessary to keep the business afloat and thus keep its entire workforce employed. In this case, we are convinced that it would be improper to impose liability under ERISA absent a showing of either economic harm to the plan[4] or a breach of the duty of loyalty.
 
 
 23
 The plaintiffs argue that they suffered economic loss in the form of "opportunity costs." The term "opportunity cost," which is borrowed from the field of economics, refers to "[t]he amount that is sacrificed when choosing one activity over the next best alternative." The Portable MBA Desk Reference 295 (Paul A. Argenti ed., 1994); see also 3 The New Palgrave: A Dictionary of Economics 718 (Eatwell, et al. eds., 1987); Robert Cooter & Thomas Ulen, Law and Economics 35 (1988). The plaintiffs' theory, as articulated in their appellate brief, is that "when the defendants took plaintiffs' money [i.e., the payroll deductions that ought to have been applied to the payment of insurance premiums] and diverted it to other uses for several months, there [was] a cost attached to that. In other words, had plaintiffs had that money to themselves, they could have used it and actually derived some benefit, i.e., interest, which is a classic definition of opportunity costs."[5] The plaintiffs' evidence, including DeMoss' deposition testimony, fails to support this theory.[6]
 
 
 24
 Although this court has acknowledged that the concept of "opportunity cost" may be relevant or instructive in some contexts, see e.g., Chronister Oil Co. v. Unocal, 34 F.3d 462, 465 (7th Cir.1994), we fail to see how this economic concept applies in the present case. Initially, we note that the plaintiffs were not entirely "deprived" of the value of the funds that ought to have been applied by the defendants towards insurance premium payments. Rather, these funds were diverted to a use that clearly benefitted all of NMC's employees, including Mira, i.e., keeping the company afloat and retaining all of the employees on the payroll. Furthermore, no amount of contrived economic theory can change the reality that the plan was reinstated and the Miras were reimbursed for any and all claims filed during the period in question. At the end of the day, the plaintiffs got exactly what they were promised under the terms of the employee benefit plan offered by NMC; thus, they suffered no economic loss.
 
 
 25
 In light of our holding that the plaintiffs suffered no economic loss, we hold that this case falls within the "no harm, no foul" rule.[7] It is a longstanding principle in civil law that there can be no monetary recovery unless the plaintiff has suffered harm. See, e.g., Brock v. Robbins, 830 F.2d 640, 647 (7th Cir.1987) ("[M]onetarily penalizing an honest but imprudent trustee whose actions do not result in a loss to the fund will not further the primary purpose of ERISA...."). Therefore, even if the defendants did breach the fiduciary duties they owed to the plaintiffs, in violation of ERISA, the Miras are not entitled to recovery of damages for that breach absent proof of an actual economic loss.[8] To hold otherwise would give the plaintiffs a windfall in the form of double recovery because, as previously noted, the plaintiffs (and the plan) have already been made whole by the reinstatement of the plan and the payment of all outstanding insurance claims.
 
 C. The Miras' Civil RICO Claim
 
 26
 We are also asked to review the district court's grant of summary judgment in favor of the defendants on the Miras' civil RICO claim. According to the Miras, the defendants repeatedly diverted plan funds to an improper use, in violation of 18 U.S.C. § 664, and thus engaged in a "pattern of racketeering activity."
 
 
 27
 RICO was originally enacted "in an attempt to eradicate organized, long-term criminal activity." Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1019 (7th Cir.1992). In order to recover treble damages, costs, and attorney's fees under the civil enforcement provisions of RICO, a plaintiff must establish, by a preponderance of the evidence, all of the elements of a criminal RICO violation. Id. § we have previously explained:
 
 
 28
 The elements of a RICO violation consist of (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. A pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten-year period. Predicate acts are acts indictable under a specified list of criminal laws.
 
 
 29
 Id. (quotation omitted).
 
 
 30
 Theft or embezzlement from an employee benefit plan, in violation of 18 U.S.C. § 664, is a "predicate act" for purposes of establishing a RICO violation. 18 U.S.C. § 1961(1). Section 664 provides criminal penalties for:
 
 
 31
 Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan ... or any fund connected therewith....
 
 
 32
 18 U.S.C. § 664 (emphasis added).
 
 
 33
 When ruling in favor of the defendants on the RICO claim, the district judge found that they lacked the requisite intent for a violation of § 664, stating: "the Miras have pointed to no evidence that could support a reasonable determination that the defendants acted with fraudulent intent, a bad purpose, or an evil motive."[9] We are of the opinion that the district judge accurately assessed the evidence. The defendants knew of the failure to make premium payments and (for some time at least) were unable to adopt proper management procedures to deal with the situation. However, neither DeMoss' deposition testimony nor any other evidence in the record supports the plaintiffs' claim that the lapse of insurance coverage resulted from "callous and deprived [sic] indifference" on the part of the defendants. To the contrary, the evidence suggests that the defendants had their employees' long-term best interests at heart but encountered such severe financial hardship that they were forced to make radical though very questionable financial decisions in order that they might stay in business and avoid laying off any employees.
 
 
 34
 While we agree that the defendants did not by any stretch of the imagination act with "a bad purpose" or an "evil motive," we need not decide whether § 664 requires this level of intent, as the district judge assumed in the absence of any controlling precedent from this circuit. The statute does not state that the conversion of plan funds must be motivated by an evil purpose; it merely prohibits the "unlawful[ ] and willful[ ]" conversion of plan funds. The conduct of NMC was unlawful and willful, even if (as the record demonstrates) the defendants had basically good intentions (i.e., keeping the company afloat and preserving jobs). We are aware that some courts, interpreting the "unlawful and willful" language in § 664, have held that a defendant must act with specific criminal intent, i.e., "a fraudulent intent or bad purpose or an evil motive." United States v. Andreen, 628 F.2d 1236, 1241 (9th Cir.1980); see also United States v. Busacca, 936 F.2d 232, 239-40 (6th Cir.1991); Young v. West Coast Indus. Relations Ass'n, Inc., 763 F.Supp. 64, 74 (D.Del.1991).[10] However, this circuit has not to date addressed the meaning and scope of the intent requirement in § 664, and we see no necessity to do so in this case because, as the trial court noted, there is another, far more obvious obstacle to the Miras' civil RICO claim. The civil remedies provided for in the RICO statute extend only to a person who has been "injured in his business or property by reason of a [RICO] violation." 18 U.S.C. § 1964 (emphasis added). For reasons discussed at length in the previous section of this decision, the plaintiffs have failed to establish that they or the plan suffered an injury (i.e., economic loss) as a result of the defendants' conduct. Thus, they are without standing to recover civil damages under RICO, and the grant of summary judgment was proper on that basis. See Dresser Industries, Inc. v. Pyrrhus AG, 936 F.2d 921, 935 (7th Cir.1991).
 
 D. Class Certification
 
 35
 Lastly, the Miras challenge the district court's denial of their motion for class certification as inconsistent with the requirements of Rule 23. Under the Federal Rules of Civil Procedure, a district court has broad discretion to determine whether certification of a class-action lawsuit is appropriate. Retired Chicago Police Ass'n, 7 F.3d at 596. Our review is "circumscribed" and we will reverse the grant or denial of class certification only for an abuse of discretion. Id.
 
 
 36
 Generally, a district judge should seriously consider certifying a class or deny certification prior to any ruling on the merits, as the language of Rule 23 itself suggests:
 
 
 37
 As soon as practicable after the commencement of an action, the court shall determine by order whether it is to be maintained. An order under this subdivision may be conditional, and may be altered or amended before the decision on the merits.
 
 
 38
 Fed.R.Civ.P. 23(c). In this case, the district judge did not rule on the plaintiffs' motion for class certification until after he had granted summary judgment with respect to two of the Miras' claims. The Miras argue that this was improper and necessitates a remand of their case to the district court. While we agree that it is the better policy for a district court to dispose of a motion for class certification promptly and before ruling on the merits of the case, the failure to follow this preferred procedure does not necessarily amount to reversible error. See, e.g., DeBruyne v. Equitable Life Assurance Society of the United States, 920 F.2d 457, 463 (7th Cir.1990) (district court was affirmed despite its "fail[ure] to resolve the class certification aspects of the complaint prior to making a conclusive determination on the merits...."). Because Mira's breach of fiduciary duty and RICO claims are so lacking in merit, we see no need to remand this case based solely on the improper timing of the district court's class certification ruling.
 
 
 39
 Furthermore, we are of the opinion that class certification would have been improper in this case even if the district court had considered the plaintiffs' motion before resolving some of the substantive issues on summary judgment. As the defendants correctly note in their brief, the Miras' claims failed to meet most, if not all, of the prerequisites for maintaining a class action. Under Rule 23, there are four such prerequisites, all of which must be satisfied in order for certification to be proper. The Rule states:
 
 
 40
 One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative of the parties will fairly and adequately protect the interests of the class.
 
 
 41
 Fed.R.Civ.P. 23(a) (emphasis added). The size of the purported class in this case was very small (approximately sixteen plan participants and their beneficiaries), and the record does not reflect that any of the potential class members sought to intervene in the plaintiffs' lawsuit, as one might expect if they had been genuinely aggrieved by the defendants' conduct. As to the remaining prerequisites for maintaining a class action, we observe that while there may have been some common questions of law and fact, the Miras' claims were hardly "typical" of the putative class. These claims included Mira's assertion that she was unlawfully terminated by NMC for asserting rights under ERISA, and that she suffered "anxiety and other distress as a result of being discharged." There is no evidence that other NMC employees were either discharged[11] or suffered emotional distress in connection with the temporary loss of health insurance coverage at NMC. The plaintiffs' claims therefore extended well beyond any causes of action that the Miras arguably shared with other NMC plan participants, and could not be considered "typical" for purposes of class certification.
 
 
 42
 To summarize: although the procedural method chosen by the district judge is not the one favored under Rule 23, we refuse to disturb his denial of class certification because (1) the plaintiffs' underlying claims clearly lack merit, as evidenced by our affirmance of the district court's summary judgment rulings, and (2) class certification would not have been appropriate even if the district judge had considered the question before disposing of two of the Miras' substantive claims on summary judgment.
 
 IV. CONCLUSION
 
 43
 This court recently had occasion to mention the virtues of summary judgment as a " 'tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact.' " Mills v. First Federal Savings & Loan, 83 F.3d 833, 846 (7th Cir.1996) (quoting United Food and Commercial Workers Union Local No. 88 v. Middendorf Meat Co., 794 F.Supp. 328, 330 (E.D.Mo.1992), aff'd, 991 F.2d 801 (8th Cir.1993)). That observation once again seems appropriate, for the ERISA and RICO portions of the Miras' lawsuit strike us as classic examples of meritless and wasteful litigation. As the defendants concede, they breached their fiduciary duties as plan administrators. However, the inescapable fact is that all of the plan participants and beneficiaries, including Mira, were made whole by the reinstatement of the plan (and, in Mira's case, the full payment of her medical insurance claims). There was, therefore, no actionable loss or injury for purposes of either the ERISA or the RICO claim, and summary judgment was clearly proper. As this court has noted, "if no rational jury could, on the evidence presented in the summary judgment proceeding, bring in a verdict for the party opposing summary judgment ... then summary judgment must be granted." Visser v. Packer Engineering Associates, 924 F.2d 655, 660 (7th Cir.1991) (emphasis added). In our considered opinion, a rational jury could not conclude that the plaintiffs suffered an economic loss because the evidence in the record establishes that the plaintiffs were made whole by the reinstatement of the plan and the payment in full of all outstanding insurance claims.
 
 
 44
 We affirm.
 
 
 
 [1]
 The appellants have failed to include a Statement of Facts in their brief, as required by Federal Rule of Appellate Procedure 28(a)(4) and Circuit Rule 28(d). Instead, they have chosen to "adopt and incorporate ... by reference" the factual summary contained in one of their earlier district-court pleadings. This practice has been condemned by this court. See Perkins v. Silverstein, 939 F.2d 463, 467 n. 1 (7th Cir.1991); Skagen v. Sears, Roebuck & Co., 910 F.2d 1498, 1500 n. 2 (7th Cir.1990)
 
 
 [2]
 ERISA makes it unlawful to "discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such person may become entitled under the plan." 29 U.S.C. § 1140. Mira claimed that the defendants had violated this provision of ERISA by wrongfully terminating her employment
 
 
 [3]
 This claim was referred to the magistrate judge with the consent of the parties, pursuant to 28 U.S.C. § 636(c)(1) and Federal Rule of Civil Procedure 73
 
 
 [4]
 As discussed below, the plaintiffs have failed to demonstrate such harm, for the plan was reinstated and all of the Miras' outstanding insurance claims were fully paid
 
 
 [5]
 During the five-month time frame in which NMC failed to make the health insurance premium payments, we estimate that Mira's weekly contributions added up to a total of a little more than $500. Although the parties have not calculated the interest that could have been made on this sum had it been invested (for example, in a mutual fund), we are talking about a small amount of money
 
 
 [6]
 As noted by the district court, all that DeMoss' testimony establishes is that the defendants incurred an economic loss as a result of their allowing the insurance coverage to lapse, for there was a cost associated with having the health insurance reinstated
 
 
 [7]
 The Latin "injuria absque damno" (or "injury without damage") also seems appropriate; the phrase refers to a wrong which results in no loss or damage, and thus cannot sustain an action. Black's Law Dictionary 785 (6th ed. 1990)
 
 
 [8]
 Because we hold that neither the plan nor the plaintiffs suffered a compensable economic loss or injury, we need not address the defendants' argument that § 1109 of ERISA falls short of conferring a private cause of action upon individual plan participants or beneficiaries for a breach of fiduciary duty with respect to the plan, nor need we address the Supreme Court's decision in Varity Corp. v. Howe, --- U.S. ----, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), which was decided after this case was briefed and orally argued
 
 
 [9]
 The magistrate judge reached a similar conclusion when she ruled in favor of the defendants on the plaintiffs' interference with ERISA rights claim, finding that "NMC's failure to pay the Plan premiums in a timely manner was the result of financial problems and not an intentional attempt to embezzle, divert, or otherwise misappropriate health care funds."
 
 
 [10]
 These cases define fraudulent intent in somewhat broad terms. Busacca, for example, states that it is possible to have the requisite "criminal intent" even if one has "a good faith intent to return the embezzled funds." 936 F.2d at 240. In dicta, Andreen suggests that "reckless disregard for the interests of the protected fund" may suffice to meet the intent requirement of the statute. 628 F.2d at 1241
 
 
 [11]
 Nor, we hasten to add, was there much evidence beyond Mira's own assertions to establish that she herself was "discharged," but this is what she alleged in her amended complaint