**CENTRAL OIL COMPANY,**
**Plaintiff, Appellee,**

v.

**M/V LAMMA–FOREST,**
**Defendant, Appellant.**

**No. 86–1941.**

United States Court of Appeals,
First Circuit.

Argued April 8, 1987.
Decided June 22, 1987.

Thomas J. Muzyka with whom Clinton & Muzyka, P.C., Boston, Mass., was on brief, for defendant, appellant.

James T. Murphy with whom Margaret L. O'Hara and Hanson, Curran & Parks,

Providence, R.I., were on brief, for plaintiff, appellee.

Before COFFIN and TORRUELLA, Circuit Judges, and MALETZ,[*] Senior Judge.

TORRUELLA, Circuit Judge.

This is an appeal from a decision of the district court of Rhode Island entered under its admiralty jurisdiction in a marine fuel oil contract dispute. *See* 28 U.S.C. § 1333.

*Background*

In June 1985 the owners of the M/V Lamma Forest, a British flag registered vessel engaged in international commerce, sought to refuel the vessel in Florida. They contacted a fuel broker, who in turn contacted Central Oil and inquired if that company could supply the vessel with 500 metric tons of Intermediate Fuel Oil 380 meeting the British Standard M–7. Central Oil responded that it could and contracted to do so.

While the fuel was loaded onto the Lamma Forest, both seller and buyer took samples. The buyers' testing agent, Lloyd's, informed them that the sample contained 39.5 parts per million (ppm) of aluminum particles, which the buyers understood to be in excess of the British Standard. After attempted negotiation, the buyers took the position that the fuel did not meet contract specifications. Central Oil requested assurances of payment. Receiving none, Central Oil had the vessel arrested in Providence, Rhode Island, under a maritime lien based on a theory of anticipatory repudiation of the fuel contract.

Central Oil sought to recover the contract price plus interest. The owners of the Lamma Forest defended on a theory of breach of warranty and counterclaimed for damages for wrongful arrest. The federal district court in Rhode Island found that the owners of the Lamma Forest had not met their burden of proof on the breach of warranty defense and that the arrest was not wrongful. The court awarded Central Oil the contract price plus twelve percent interest running from July 31, 1985.

On appeal the M/V Lamma Forest alleges four errors: the ruling on the breach of warranty defense, the exclusion of a telex to the Lamma Forest, the wrongful arrest ruling, and the award of 12% interest. We examine each in turn.

I. *Breach of Warranty*

The Lamma Forest defended on a theory of breach of the explicit warranty to provide fuel oil that would meet the British Standard M–7 and on a theory of breach of the implied warranty of merchantability under the Uniform Commercial Code (which has been adopted in both Florida and Rhode Island). The Lamma Forest considered these warranties to be the same, on the theory that both are based on compliance with the British Standards, and the case was tried on that basis. Accordingly, we do not consider whether the implied warranty could have been breached in the absence of a breach of the explicit warranty.

The Lamma Forest, which had the burden of proof on this matter, argued that the fuel oil had an aluminum content of 39.5 ppm, which exceeds the British Standard maximum of 30 ppm. Central Oil defendant this claim by denying that the British Standards set a maximum level for aluminum content. Thus, the case turned on whether the British Standards set a maximum aluminum content for fuel oil. The district court found that the British Standards did not. Considering this issue on appeal requires a close analysis of the British Standards for fuel.

In 1982 the British Standards Institution published its British Standard specification for petroleum fuels for marine oil engines and boilers. *See* BSI document No. BS–MA 100: 1982. This publication lists specifications for a number of properties of fuel oil. The publication also lists "other properties for which requirements will be specified when test methods are developed." Included in the table of "other properties" is aluminum content, with a maximum of

[*] Of the United States Court of International Trade, sitting by designation.

30 ppm listed in the table. *See* BS–MA 100: 1982 at 8. According to buyer's expert witness, the petroleum industry had developed test methods to measure aluminum content, but these methods had not been adopted by the British Standards Institution by 1982 when the fuel oil standards were published. The petroleum industry was apparently using the 30 ppm figure for internal purposes and there was some understanding that that figure was an appropriate one.

At trial, the Lamma Forest admitted that in 1982 an aluminum content maximum was not part of the British Standards. But it claimed that by 1985 test methods had been developed, making the 30 ppm aluminum maximum part of the British Standard for fuel oil. In support of that claim the Lamma Forest offered the testimony of its expert, Brent Mackin, a chemist and general manager employed by Caleb Brett, the marine inspection company that performed the Lamma Forest fuel analysis for Lloyd's.

Mackin described two types of tests that are capable of measuring the aluminum content of fuel oil. He testified that the tests are routinely performed and that the 30 ppm figure for aluminum is accepted in the trade as part of the British Standard. Nevertheless, the British Standards Institution's fuel oil specifications publication provides that "British Standards are revised, when necessary, by the issue either of amendments or of revised editions." *See id.* at back cover. The Lamma Forest provided no evidence of amendments or revised editions of the specifications. Nor did they call anyone who could speak for the British Standards Institution.

We cannot say whether the approval of test methods for aluminum content would call for a revision of the British Standard specification for fuel oil; the absence of amendments or revised editions, then, is not conclusive as to whether the aluminum maximum is part of the standards. Nor can we say whether a publication of the British Standards Institution can be amended by industry practice in the absence of

official action by that body. We simply do not know how the Institution operates.

■ Burdens of proof serve a useful purpose in situations like this. Thanks to the burden of proof, the absence of information, and resultant lack of understanding, is not paralyzing. Rather, the absence of information compels a certain result; the party who bears the burden of proof loses. Such was the case here. The district court was well within its discretion in concluding that the Lamma Forest did not prove that the aluminum content maximum was part of the British Standard.

II. *The Exclusion of the Lloyd's Telex*

■ The telex at issue is a telex from the Lamma Forest's fuel broker to the Lamma Forest that contains a verbatim quote of a telex from Lloyd's to the vessel's managers. The Lloyd's telex lists the numerical results of a test of the fuel sample and gives several opinions about the oil: that it is abrasive, that it will lead to wear of the engine, that it not be used in the vessel's engine, and that the fuel tanks be thoroughly cleaned after the oil is removed. The Lamma Forest sought to have the telex admitted under the business records exception to the hearsay rule. *See* Fed.R. Evid. 803(6). The trial judge refused to admit the telex to prove the truth of the opinions it contained.

We are not entirely at ease with this ruling, largely because the trial judge did not explain it in terms of the "trustworthiness" inquiry mandated by Rule 803(6). *See Petrocelli v. Gallison,* 679 F.2d 286, 289, 291 n. 3 (1st Cir.1982). Nevertheless, we need not reach this issue because the admission of the telex would not have changed the ruling on breach of warranty. The telex says nothing about whether the fuel meets British Standards, or whether the British Standards include a maximum aluminum content. Had the Lamma Forest tried the case on the theory that there was an implied warranty that the fuel oil would contain less than 30 ppm of aluminum, regardless of what the British Standards were, then perhaps the telex would have been more probative. But, our review of

the transcript, the papers filed below, and the briefs on appeal reveals that the Lamma Forest did not try the case on that basis. Accordingly, any error in the exclusion of the Lloyd's telex was harmless.

### III. *Wrongful Arrest*

The Lamma Forest presses its wrongful arrest claim on the theory that the contract provided for payment on July 31, seven days *after* Central Oil had the vessel arrested. No money was yet due; thus, Central Oil acted in bad faith. Central Oil defended by asserting its good faith belief that the Lamma Forest had repudiated the contract and that the vessel would be outside United States waters when payment became due under the contract.

The Lamma Forest took delivery of the fuel oil on July 1, 1985. Terms of payment were 30 days after delivery. On July 15, the owners of the Lamma forest notified Central Oil of their position that the fuel oil was non-conforming. Central Oil requested assurance that payment would be made on time according to industry practice, that is, notwithstanding the dispute as to quality. The fuel company received no assurance. On July 22, Timothy Dick, a Vice-president of Central Oil, flew to Providence, Rhode Island, where the vessel was docked, to negotiate a resolution of the problem. The parties did not reach a mutually satisfactory solution. When Mr. Dick returned to Florida that day, he sent a second request for assurance, this time demanding immediate payment. Having received no response by July 24 and believing that the vessel was about to leave American waters, Mr. Dick had the Lamma Forest arrested in Providence Harbor under a maritime lien. The owners of the Lamma Forest promptly posted $120,000 as substitute security and the vessel was released within a few hours of the arrest.

■ To recover for wrongful arrest, the Lamma Forest must prove gross negligence or malice. *See Frontera Fruit Co. v. Dowling*, 91 F.2d 293, 297 (5th Cir.1937). The district court found that there was no wrongful arrest because Central Oil had a good faith belief that the owners of the Lamma Forest had repudiated the fuel oil contract.

■ Under U.C.C. § 2–609, a seller with reasonable grounds for insecurity may request assurances that performance will be tendered as promised. The failure to give such assurances, in appropriate circumstances, constitutes an anticipatory repudiation of the contract. *See* U.C.C. § 2–609(4). In light of the anticipatory repudiation, the aggrieved party may treat the contract as breached and immediately sue for damages, again in appropriate circumstances. *See* U.C.C. § 2–610. Comment 3 to U.C.C. 2–610 states that whether a party may sue immediately for damages depends on the harm that would result if the party were required to wait until the date of tender under the contract. Here Central Oil had a reasonable belief that the vessel would be out of American waters, and out of the reach of the courts of the United States, by the date of tender under the contract.

In any case, the district court's task was not to determine whether there was anticipatory repudiation and, if so, whether immediate relief was proper. Rather, the district court's task was to determine whether Central Oil acted with gross negligence or malice in proceeding under a theory of anticipatory repudiation and immediate relief. Based on the facts and law as just recited, we find that the court's decision that Central Oil acted in good faith was not clearly erroneous.

### IV. *Interest*

The district court ordered interest to run from July 31, 1985, at the rate of 12%. The Lamma Forest complains that the 12% interest rate was too high, because 28 U.S.C. § 1961 provides that post judgment interest is to be set by the auction price of U.S. Treasury Bills. The appropriate rate for interest on a judgment from a federal district court for August 5, 1986, is 6.18%, according to the Lamma Forest. Central Oil accedes. Therefore, the interest rate from July 31, 1985 to August 5, 1986 shall be 12%. Thereafter the rate shall be 6.18%.

**52**

*Conclusion*

The decision of the district court, with the exception of post judgment interest, is affirmed. The decision of the district court on post judgment interest is reversed. The case is remanded to the district court to award interest at the appropriate rates. Appellants shall bear the costs of appeal.