[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-15130
Non-Argument Calendar
_____

D.C. Docket No. 1:13-cv-22655-MGC


INDUSTRIAL MARITIME CARRIERS, LLC,

Plaintiff-Appellant,

versus

DANTZLER, INC.,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 29, 2015)

Before HULL, ROSENBAUM and JULIE CARNES, Circuit Judges.

PER CURIUM:

This appeal arises from the alleged wrongful arrest of a vessel.  Following

entry of summary judgment in the Southern District of Florida in favor of

defendant Dantzler, Inc. ("Dantzler") on the alleged wrongful arrest, plaintiff Industrial Maritime Carriers, LLC ("IMC") appeals to this Court.

## I.    Background

Dantzler, a Florida corporation, was awarded a judgment on September 5, 2007 by a Brazilian court against Monsted Chartering ("Monsted").  To collect the judgment, the Brazilian court authorized the arrest of a vessel operated by Scan-Trans Holdings A/S ("Scan-Trans"), a purported successor-in-interest to Monsted. Dantzler's Brazilian counsel, Paulo Madeira ("Madeira"), requested that the Brazilian court arrest one of Scan-Trans' fleet.  He presented to that court a Scan-Trans fleet list (taken from Scan-Trans' website), which listed the M/V Industrial Fighter ("Industrial Fighter") as one of Scan-Trans' vessels, and evidence showing that the Industrial Fighter would be arriving on June 14, 2013 in a Brazilian port. The Brazilian court reviewed the evidence and issued an arrest order on June 7, 2013 for the Industrial Fighter.  The Industrial Fighter was then seized on June 18, 2013.

IMC, a Bermudan company that, at the time of the seizure, was time-chartering the Industrial Fighter, sent a letter by email and certified United States mail to Dantzler on June 19, 2013.  The letter stated that neither Monsted, Scan-Trans, nor any other successor of Monsted held an interest in the vessel, and supported this assertion with reports from various shipping industry publications

2

that indicated that a German company, MS "ERIS J" Schiffahrtsgessellschaft mbH & Co. KG ("Eris"), actually owned the vessel.  The letter also requested the immediate release of the Industrial Fighter.  Because the letter was addressed to "Dantzler, Inc. Legal Department," and Dantzler does not have a legal department, Dantzler states that it did not receive this communication in a timely manner.

The next day, on June 20, 2013, IMC sent a similar letter, this time by facsimile and certified mail, to Dantzler's registered agent.  Dantzler's President, Antonio Godinez ("Godinez"), received the letter, and passed along its contents to Dantzler's United States counsel and Madeira.  Dantzler's United States legal counsel contacted IMC, and the next day, on June 21, 2013, IMC sent a letter to that counsel, reiterating that the Industrial Fighter was being mistakenly held and demanding its release.  Meanwhile, on June 20, 2013, Eris, the German company that actually owned the ship, petitioned the Brazilian court for the release of the Industrial Fighter, which that court granted on June 24, 2013.  The vessel was thus released on June 25, 2013.

IMC then filed suit in the Southern District of Florida for wrongful arrest of a vessel and tortious interference with contract and business relationships. Dantzler answered, denying that it had acted in malice, bad faith, or recklessness in seizing the Industrial Fighter, and raising the affirmative defense of reliance on the advice of counsel.  Dantzler also moved for summary judgment.  IMC opposed

3

summary judgment, asserting that there were disputed issues of material fact: namely, (1) the question of whether Dantzler had in fact acted with malice, bad faith, or recklessness and (2) whether Dantzler had in fact honestly relied on the advice of counsel.  The district court granted summary judgment to Dantzler, holding that "[t]he record evidence demonstrates that Dantzler, honestly and in good faith, did nothing except rely on the advice of counsel to discharge the duty for which Dantzler hired counsel."

> [B]ased upon competent, albeit faulty evidence, Madeira petitioned the Brazilian Court to arrest a vessel he thought to be operated by Monsted's successor in interest.  Upon the receipt of notice that Dantzler had arrested property not belonging to Monsted, Godinez immediately communicated with its United States and Brazilian counsel that an error may have been made, and honestly sought advice as to how to proceed.

Following the entry of summary judgment for Dantzler, IMC filed this appeal.  IMC argues that issuance of summary judgment was inappropriate, as material issues of fact exist as to whether Dantzler arrested the Industrial Fighter in bad faith, malice, or recklessness and as to whether Dantzler's reliance on counsel was in good faith.

## II.    The Applicable Law

"We review a district court's grant or denial of summary judgment *de novo*, considering all the facts and reasonable inferences in the light most favorable to the nonmoving party."  *Norfolk S. Ry. Co. v. Groves*, 586 F.3d 1273, 1277 (11th Cir.

4

2009).  Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case."  *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "Although all justifiable inferences are to be drawn in favor of the nonmoving party, the moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing of an essential element of the case."  *Manor Healthcare Corp. v. Lomelo*, 929 F.2d 633, 636 (11th Cir. 1991).

The arrest of a vessel arises under admiralty law.  *See Marastro Compania Naviera, S.A. v. Canadian Mar. Carriers, Ltd.*, 959 F.2d 49, 53 (5th Cir. 1992) ("Maritime law controls the substantive law of maritime seizures . . . .")  It is within the United States district courts' "traditional maritime powers . . . to fashion admiralty procedures . . ." for the seizure of vessels.  *Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. De Navegacion*, 773 F.2d 1528, 1531 (11th Cir. 1985) (en banc).  Congress has, however, "retained the power to alter substantive and procedural maritime rules" and has instituted various procedural safeguards, but these have not included the right to a pre-arrest hearing.  *Id.*; *see*

5

Fed. R. Civ. P. Supp AMC B.  The rationale for denying pre-arrest process is that it would potentially give a foreign party the opportunity to abscond prior to the resolution of the dispute.  *See Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864, 870 (11th Cir. 2010).  The absence of pre-arrest process, however, means that erroneous seizures may occur, because "ownership interests in shipping often are shrouded by a tangled web of legal interests whose identities are impossible for a judge to discern within the time frame in which writs of attachments must issue." *Leonhardt*, 773 F.2d at 1538.  The protection United States law provides to mitigate this risk is, first, the ability to file for a "prompt postgarnishment hearing before a judge."  *Id.* at 1538-39 (quotation marks removed).  "An immediate postattachment hearing strikes a workable balance between the creditor's need to reach the property before it leaves the court's jurisdiction and a debtor's fear that his property will be unjustly attached."  *Id.*; *see also Neapolitan Navigation, Ltd. v. Tracor Marine Inc.*, 777 F.2d 1427, 1430 (11th Cir. 1985) (same).

Of course, the above procedures do not apply in this case because the arrest was made through Brazilian courts following Brazilian law.  Nonetheless, a second safeguard is relevant to this case:  the action for wrongful attachment.  "It is an established principle of maritime law that one who suffers a wrongful attachment may recover damages from the party who obtained the attachment, provided he prove that such party acted in bad faith."  *Furness Withy (Chartering), Inc.,*

6

*Panama v. World Energy Sys. Assocs., Inc.*, 854 F.2d 410, 411 (11th Cir. 1988)

("*Furness II*"); *Frontera Fruit Co., Inc. v. Dowling*, 91 F.2d 293, 294 (5th Cir.

1937) ("these awards are necessarily based on findings of bad faith, malice, or such

negligence as would constitute bad faith . . . .")[1]; 2 Admiralty & Mar. Law § 21-5

(5th ed.) ("A plaintiff may be liable for damages for wrongful arrest or attachment

and detention of a vessel only upon a showing of bad faith, malice or gross

negligence.")  As our key precedent explains:

> The gravamen of the right to recover damages for wrongful seizure or detention of vessels is the bad faith, malice, or gross negligence of the offending party.  The reasons for the award of damages are analogous to those in cases of malicious prosecution.  The defendant is required to respond in damages for causing to be done through the process of the court that which would have been wrongful for him to do himself, having no legal justification therefor and acting in bad faith, with malice, or through a wanton disregard of the legal rights of his adversary.

*Frontera*, 91 F.2d at 297 (citations removed).  Further, "the advice of competent

counsel, honestly sought and acted upon in good faith is alone a complete defense

to an action for malicious prosecution." *Id.*; *Marastro*, 959 F.2d at 53 (same).

Thus, the plaintiff bears the burden of proving that the attachment was done in bad

---

[1]  "[D]ecisions of the United States Court of Appeals for the Fifth Circuit (the 'former Fifth' or the 'old Fifth'), as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit." *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1207 (11th Cir. 1981).

faith, and if the defendant establishes that it honestly relied on the advice of counsel in attaching the vessel, then there is no liability.[2]

As for IMC's tortious interference claim, this claim is properly subsumed under the wrongful attachment claim. As we have held in the context of a party seeking to recover on wrongful attachment and conversion theories (the latter of which does not require bad faith), the proper cause of action in such cases is wrongful attachment, not some other cause of action taken from the common law. *Furness II*, 854 F.2d at 412 ("[M]aritime precedent has answered, albeit implicitly, the question of what a claimant must prove to recover for a conversion caused by an improper attachment. The claimant must prove bad faith by the party who obtained the attachment."); *see also Incas & Monterey Printing & Packaging, Ltd. v. M/V Sang Jin*, 747 F.2d 958, 964 (5th Cir. 1984) ("Since the admiralty is not concerned with common law labels as to theories of recovery, or causes of action, we are entitled to treat this broadly as a claim for wrongful seizure, whether denominated as such or as one for abuse of process, malicious prosecution, or all three.") (citing *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625

---

[2] Where the maritime attachment has been made by order of a United States district court, 28 U.S.C. § 1921(a)(1)(E) permits the court to tax the fees and costs to either one of the parties. *See Marastro*, 959 F.2d at 53-54 (taxing costs to defendant, even though it was not liable for wrongful attachment). The district court below recognized that the applicability of 28 U.S.C. § 1921(a)(1)(e) was disputed by the parties, and stated that it would decide that issue at the appropriate time. That issue is not before this Court on this appeal, and we express no opinion on the matter.

(1959)).  Therefore, like the district court, we do not consider this claim separately from the wrongful attachment claim.  The parties do not dispute this on appeal.

## III.    Application of the Law to IMC's Claim

Thus, to recover against Dantzler, IMC must show that Dantzler acted in "bad faith, with malice, or through a wanton disregard of the legal rights of his adversary."  *Frontera*, 91 F.2d at 297.  The district court concluded that because IMC had failed to provide evidence of bad faith, Dantzler was entitled to summary judgment.

In contending that there exists a genuine dispute as to whether Dantzler acted in bad faith, IMC points us to various actions that Dantzler failed to take before and after the arrest of the Industrial Fighter.  First, in support of its position that Dantzler acted in bad faith in seizing the Industrial Fighter, IMC argues that "Dantzler failed to provide the Brazilian court with information pertinent to the arrest, that is the true identity of the vessel's owner."  This is misleading.  Insofar as it pertains to the initial arrest of the vessel, there is no evidence in the record to support the conclusion that Dantzler knew before the arrest that the vessel belonged to Eris.  Indeed, IMC elsewhere recognizes that Dantzler *would have known* (that is, it did not actually know) that the Industrial Fighter belonged to Eris had Dantzler consulted various maritime publications and resources.  But that is just to say that Dantzler proceeded with negligence, that is, "[t]he failure to

9

exercise the standard of care that a reasonably prudent person would have exercised in a similar situation . . . ." *Black's Law Dictionary* (10th Ed. 2014). As *Frontera* makes clear, mere negligence is insufficient for liability. 91 F.2d at 297.

As the allegation that Dantzler withheld information pertains to Dantzler's actions once it had been notified by IMC that the vessel belonged to Eris, this is likewise misleading because, as the record shows, Dantzler did immediately notify Madeira and its United States counsel, those attorneys immediately contacted IMC, and Madeira then notified the court. In one of our few precedents to address the issue of wrongful arrest and bad faith, we explained that the district court did not err in determining that there was no bad faith when the defendant was notified that it was seizing the wrong party's vessel, but requested from that party further evidence to support that fact, rather than immediately releasing the vessel. *Furness Withy (Chartering), Inc., Panama v. World Energy Sys. Assocs., Inc.*, 772 F.2d 802, 808 n.9 (11th Cir. 1985) ("*Furness I*"). Thus, as *Furness I* indicates, there is no duty to do anything beyond diligently investigating the new information. The arresting party need not immediately seek the release of a vessel just because the arrest is contested. Dantzler's conduct in passing the information on to its counsel shows no negligence and IMC suggests no specific course of action that would have materially hastened the release of the Industrial Fighter. That Dantzler relied on its counsel to handle the matter rather than contact the Brazilian court directly,

10

as IMC suggests it should have done, is no sign of bad faith.  Rather, it just shows that Dantzler was doing what people and companies hire lawyers to do:  handle their legal affairs.

Second, IMC argues that Dantzler had "implied knowledge of the impropriety of the arrest" because it knew of maritime industry resources that had information about vessel ownership, yet failed to consult those resources before seeking the seizure of the Industrial Fighter.  As stated, however, IMC is again simply saying that Dantzler was negligent in failing to consult those resources, and negligence is insufficient for liability under the *Frontera* standard.  *See Frontera*, 91 F.2d at 294, 297.  Casting as "implied knowledge" the fact that such resources would have shown that the Industrial Fighter was owned by Eris, not Scan-Trans, does not make Dantzler's behavior rise above the level of negligence.

A district court case relied upon by IMC for this point illustrates the difference between Dantzler's conduct and bad faith conduct.  *See Coastal Barge Corp. v. M/V Maritime Prosperity*, 901 F.Supp. 325 (M.D. Fla. 1994).  There, following a maritime collision, the arrestor arrested the arrestee's vessel not once, but twice.  *Id.* at 326.  After the first arrest, the arrestor, "in exchange for [the arrestee's] assumption of liability [for a collision], had agreed not to subject [the vessel] to any further arrest as a means of securing [the arrestor's] claim of damages."  *Id.* at 327.  However, "driven by its conviction that its promise not to

rearrest the ship had been given for illusory consideration," the arrestor rearrested the ship without informing the court of the agreement. *Id.* at 328. The evidence before the court was unequivocal that the arrestor "knew full well of the ship's right not to be rearrested by it." *Id.* at 329. By gambling that the agreement was invalid, the district court held, the arrestor was proceeding recklessly. *Coastal Barge*, 901 F.Supp. at 328-29. IMC tries to analogize Dantzler's behavior to the arrestor's in *Coastal Barge*, arguing that in both cases pertinent information was withheld from the courts in seeking to arrest (or rearrest) the vessel. But in *Coastal Barge* it was clear that the arrestor knew of the previous agreement not to rearrest the vessel—there was a contract, after all—whereas here, the most IMC can point to is information that Dantzler could have, but did not, consult. That is, of course, precisely the difference between negligence and recklessness—that is, "[c]onduct whereby the actor does not desire harmful consequence but nonetheless foresees the possibility and consciously takes the risk." *Black's Law Dictionary* (10th Ed. 2014).

This inference is reinforced by another district court case cited by IMC in its "implied knowledge" argument. *See Sea Star Line Caribbean, LLC v. M/V Sunshine Spirit*, No. 09-1152(JAF), 2009 WL 3878246 (D.P.R. Nov. 13, 2009). In *Sea Star*, the defendant had the plaintiff's vessel arrested, despite there being a contract between the parties expressly prohibiting arrest should any dispute arise.

12

*Id.* at *4-5. In granting summary judgment to the plaintiff, the district court noted that the defendant "is charged with implied actual knowledge of the . . . clause, and it is a sophisticated business entity engaged in the trade of carriage of goods by sea." *Id.* at *6. IMC reads *Sea Star* for the proposition that "bad faith may be presumed where the arrestor is a sophisticated business entity engaged in the carriage of goods by sea and has implied knowledge of the impropriety of the arrest." The facts of *Sea Star*—involving a contract between sophisticated parties that expressly forbade the arrest of the vessel—allowed the imputation of "implied knowledge" to the defendant. But those factors are quite different from the facts of this case, in which, again, IMC simply argues that Dantzler should have consulted more resources before being satisfied that the Industrial Fighter was owned by Scan-Trans. To repeat, bad faith may be found in acting in disregard of what one knows; failing to take reasonable precautions leads only to a conclusion of negligence.

*Coastal Barge* and *Sea Star*, upon which IMC relies heavily, therefore do not support the conclusion that Dantzler's conduct was anything more than negligent. Instead, the facts of those cases illustrate the gulf between what amounts to bad faith in wrongful arrest cases and what Dantzler is alleged to have done here.

13

Finally, IMC argues that Dantzler and its president, Godinez, should have exercised more supervision of Madeira, rather than permit him to pursue the attachments of vessels on his own.  But even if Dantzler had a duty to supervise its attorney, IMC points to no facts that could support the conclusion that Dantzler should have known that Madeira was acting inappropriately (or even a conclusion that Madeira was indeed acting inappropriately), except for the fact that the arrest of the Industrial Fighter turned out to be erroneous.  Moreover, IMC cites nothing specific that Dantzler, whose headquarters are in Florida, should have been doing to supervise its Brazilian attorney in his representation of Dantzler's interests in Brazil.  As such, it has therefore failed to place any facts in dispute.  Clients routinely rely on their attorneys to handle their legal affairs.  Our "wrongful arrest" jurisprudence emphasizes this point by making honest reliance on advice of counsel an absolute defense.  *See Frontera*, 91 F.2d at 297.

The district court therefore did not err in deciding that IMC had put into reasonable dispute no facts that would preclude summary judgment for Dantzler.  What IMC has provided at most shows Dantzler's or Madeira's negligence in pursuing the recovery of the debt owed to it by Monsted.  It shows no malice, recklessness, or bad faith toward IMC, because IMC has cited no evidence that would indicate that Dantzler had knowledge that Madeira's conduct was infringing on the rights of IMC.

14

The jurisprudence of other circuits supports this conclusion. For example, in *Marastro*, a judgment creditor seized cargo it believed to belong to an alter ego of its judgment debtor, which, because the subject cargo was aboard a chartered vessel and there was no place to unload it, necessitated the arrest of the vessel as well, forcing it to remain in port for several days. 959 F.2d at 50-51. Although the cargo owner turned out not to be an alter ego of the judgment debtor, and therefore the seizure was improper, the Fifth Circuit affirmed the district court's denial of the wrongful arrest claims of the cargo owner and the vessel charterer because the mistake about ownership was, however erroneous, not in bad faith. *Id.* at 53.

Similarly, courts have not found an arresting party liable just because it turns out that it had the losing legal argument in the underlying dispute leading to the attachment. For example, the First Circuit affirmed a grant of summary judgment to the defendant on a wrongful arrest claim where that defendant, anticipating a breach of a contract to provide fuel, attached the plaintiff's vessel prior to the payment due date on the contract, claiming that it feared the vessel would be gone from United States' waters by the time the payment would be due. *Central Oil Co. v. M/V Lamma-Forest*, 821 F.2d 48, 51 (1st Cir. 1987). Likewise, where an attachment arose from a disagreement between the parties as to whether Canadian or United States maritime lien law applied to their dispute, the Fourth Circuit found no bad faith, even though it determined that the attachment was illegal under

15

the governing (Canadian) law.  *Ocean Ship Supply, Ltd. v. MV Leah*, 729 F.2d 971, 974 (4th Cir. 1984).

As these cases make clear, wrongful arrest is not a tool to redress good-faith mistakes of a party's identity (*Marastro*) or the law (*Central Oil*, *Ocean Ship*), even though these mistakes may turn out to be costly.  These are the types of mistakes that our admiralty procedures anticipate and accept as a necessary evil to be suffered in the interests of preventing parties from fleeing a court's jurisdiction before the dispute can be adjudicated.  *Leonhardt*, 773 F.2d at 1538.  These cases further make clear that the sort of error made by Dantzler in attaching the Industrial Fighter is well within what the courts have held to be, at most, negligent error.  No facts that IMC has produced could be reasonably construed as evidence of bad faith.  Rather, they are the sorts of mistakes routine in maritime attachments. Thus, because we agree with the district court that IMC has failed to carry its burden in raising issues of material fact, summary judgment was appropriate.[3]

## IV.    **Overruling *Frontera***

Finally, perhaps realizing that this Circuit's law does not support its case, IMC asks us to overrule *Frontera* and fashion an alternative standard for wrongful attachment, one under which "Dantzler would be exposed to liability for the

---

[3]  Because we agree with the district court that IMC has failed to carry its burden to survive summary judgment, we need not address Dantzler's affirmative defense that, even if the arrest of the Industrial Fighter rose above the level of negligence, Dantzler was relying in good faith on the advice of counsel.

16

negligent acts and misrepresentations of its attorney and agent." *Frontera*, IMC complains,

> [P]roduces an inequitable result because it places an immense burden on the innocent owner or charterer of an improperly seized vessel, requiring that the owner, charterer or other affected party prove by a preponderance of the evidence the arrestor's actions arose from malice, bad faith or a reckless disregard for the affected party's legal rights.

Whatever may be the merits of IMC's criticism of *Frontera* and the undesirable policy interests that it allegedly promotes, we are bound by it as our precedent. We have relied on *Frontera*. *See Furness I*, 772 F.2d at 808; *Furness II*, 854 F.2d at 411. Our district courts have also done so. *See, e.g., Coastal Barge*, 901 F.Supp. at 328-29; *Hyundai Heavy Indus. Co., Ltd. v. M/V Saibos FDS*, 163 F.Supp.2d 1307, 1315-16 (N.D. Ala. 2001); *John W. Stone Oil Distrib., Inc. v. M/V Miss Bern*, 663 F.Supp. 773, 778 (S.D. Ala. 1987). Other courts have cited it approvingly. *See, e.g., U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 392 n.4 (3d Cir. 2002); *Arochem Corp. v. Wilomi, Inc.*, 962 F.2d 496, 499 (5th Cir. 1992); *Central Oil*, 821 F.2d at 51; *Ocean Ship Supply*, 729 F.2d at 974. Finally, as this Court has held since its inception, "a prior decision of the circuit (panel or en banc) c[annot] be overruled by a panel but only by the court sitting en banc." *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981). *Frontera* is therefore precedent unless and until we overrule it en banc. We therefore must decline IMC's invitation.

17

## V.      Conclusion

For the reasons explained above, we affirm the district court in its grant of summary judgment to Dantzler.

**AFFIRMED.**